ORIGINAL

J. William Ebert, Esq. (Nevada Bar. No. 2697)
**EBERT JAKOBSON, LTD.**
1160 Town Center Drive, Suite 250
Las Vegas, NV 89144
Tel.:   702.228.9400
Fax:    702.228.8228

Norman H. Beamer
Mark D. Rowland
Kevin P. B. Johnson
Renée L. Stasio
Ray R. Zado
Andrew T. Oliver
**FISH & NEAVE**
525 University Avenue
Palo Alto, California 94301
Tel.:   650.617.4000
Fax:    650.617.4090

Attorneys for Plaintiffs and Counterdefendants,
Harrah's Entertainment, Inc. and Harrah's Operating Company, Inc.



## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| HARRAH'S ENTERTAINMENT, INC., and HARRAH'S OPERATING COMPANY, INC., | CV-S-01-0825-KJD-RJJ |
| Plaintiffs/Counterdefendants, | **DECLARATION OF RAY R. ZADO IN SUPPORT OF PLAINTIFFS'** |
| v. | **OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PLAINTIFFS'** |
| STATION CASINOS, INC., BOULDER STATION, INC., PALACE STATION HOTEL & CASINO, INC., SANTA FE STATION, INC., SUNSET STATION HOTEL & CASINO, INC., TEXAS STATION, INC., GREEN VALLEY RANCH GAMING, LLC, and DOES 1-20, | **REPLY IN SUPPORT OF MOTION NO. 1, OR IN THE ALTERNATIVE, TO FILE A SURREPLY** |
| Defendants/Counterclaimants, | |

231

I, Ray R. Zado, hereby declare as follows:

I am a member of the bar of the State of California and an associate at the law firm of Fish & Neave, counsel for Plaintiffs' Harrah's Entertainment, Inc. and Harrah's Operating Company, Inc. ("Harrah's"). I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion to Strike Plaintiffs' Reply in Support of Motion No. 1, or in the Alternative, to File a Surreply. I have personal knowledge as to the facts contained herein and could competently testify thereto.

1.     Attached hereto as **Exhibit 1** is a true and correct copy of *Actel Corp.* v. *Quicklogic Corp.*, 1996 WL 297045 at *5 (N.D. Cal. May 29, 1996).

2.     Attached hereto as **Exhibit 2** is a true and correct copy of *Porter* v. *Fairbanks Capital Corp.*, 2003 WL 21210115 at *1, *7 (N.D. Ill. May 21, 2003).

3.     Attached hereto as **Exhibit 3** is a true and correct copy of *Ty, Inc.* v. *The Jones Group, Inc.*, 2001 WL 1414232 at *2 (N.D. Ill. Nov. 9, 2001).

4.     Attached hereto as **Exhibit 4** is a true and correct copy of *CSC Consulting, Inc.,* v. *Tosco Refining Co.*, 1998 WL 30035 at *1 n.1 (N.D. Cal. Jan 5, 1998), *rev'd on other grounds*, 19 Fed. Appx. 698 (9th Cir. Sept. 26, 2001).


I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct. Executed on June 23, 2003, at Palo Alto, California.

Ray R. Zado

EX 1

Not Reported in F.Supp.
**(Cite as: 1996 WL 297045 (N.D.Cal.))**
**<KeyCite History>**

Only the Westlaw citation is currently available.

United States District Court, N.D. California.

**ACTEL CORPORATION, a California corporation, Plaintiff,**
v.
**QUICKLOGIC CORPORATION, a California corporation, Defendant.**

**No. C 94-20050 JW.**

May 29, 1996.

Edward Anderson, Skjerven, Morrill, MacPherson, Franklin & Friel, San Jose, CA.

Terrence P. McMahon, Orrick, Herrington & Sutcliff, Menlo Park, CA.

Jeffrey A. Miller, Lyon & Lyon, San Jose, CA.

Paul C. Valentine, Sacramento, CA.

ORDER DISQUALIFYING COUNSEL

WARE, District Judge.

**\*1** This case presents a recurring problem facing the legal profession: protection of confidential attorney-client information against disclosure by summer associates and paralegal employees.

Defendant Quicklogic Corporation moves the Court to disqualify Michael Oleinik and Lyon & Lyon from representing Plaintiff Actel Corporation in this lawsuit on the ground that an associate attorney of Lyon & Lyon who is now working for Actel on the case, previously worked for Quicklogic on the case and had access to Quicklogic's confidential information. The motion was referred to Mr. Paul Valentine, the Special Master appointed in the case. On April 25, 1996 Master Valentine reported to the Court and recommended that the motion be granted. A copy of his Report and Recommendation is attached to this Order.

After considering *de novo* the question of disqualification, the responses of the parties with respect to the Master's recommendation and after conducting a hearing, the Court finds that Mr. Oleinik's handwritten record that he read the "case file" convinces the Court that he has possession of confidential information of Quicklogic materially related to this case. No screening of Mr. Oleinik from the case was done by Lyon & Lyon when it knew of his prior employment and was informed by Mr. Oleinik that he did not believe that he had worked on the Quicklogic case. It was encumbent upon Lyon & Lyon to verify Mr. Oleinik's supposition before assigning him to work for Actel.

Except for actions necessary to transfer the file to successor counsel, effective immediately, Mr. Oleinik and Lyon & Lyon are disqualified from representing Actel in this case. Lyon & Lyon is, however, permitted to turn over its entire file to successor counsel. The litigation is ordered stayed for 30 days to permit orderly transition to successor counsel.

The Court regrets that this Order adversely affects Actel, which is wholly without fault. The Court hopes that the sanction which is being imposed in this case will encourage Lyon & Lyon and other law firms which might fall victim to these regrettable circumstances to verify that individuals, both lawyers and paralegals, previously employed by opposing counsel have no conflicts of interest.

Paul C. Valentine, SBN 32032
Law Office of Paul C. Valentine
400 Capitol Mall, Ninth Floor
Sacramento, California 95814
Telephone: (916) 449-3948
SPECIAL MASTER
UNTIED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION
ACTEL CORPORATION, a California
corporation,
Plaintiff and
Counterclaim
Defendant,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1996 WL 297045, *1 (N.D.Cal.))

v.
QUICKLOGIC CORPORATION, a California
corporation,
Defendant and
Counterclaimant.
No. C-94 20050 JW (PVT).
RECOMMENDATION OF THE SPECIAL
MASTER TO GRANT QUICKLOGIC
MOTION TO DISQUALIFY
LYON & LYON

PAUL C. VALENTINE, Special Master.

## INTRODUCTION

In this Motion for Disqualification, Defendant
QuickLogic seeks to disqualify the law firm of
Lyon & Lyon, counsel for plaintiff Actel
Corporation. The basis for the motion is the
employment by Lyon & Lyon of Michael
Oleinik, an attorney at Lyon & Lyon who
worked as a law clerk at Skjerven Morrill for
part of a summer during the time he was
attending law school. This litigation was on-
going during that summer, and although Mr.
Oleinik has said he has no recollection of the
events, his time sheets show that he worked
on this same litigation during his time at
Skjerven Morrill. Since being employed at
Lyon & Lyon, he has also performed work on
this case. Skjerven Morrill brought this
motion after seeing Mr. Oleinik at a motion
before the Special Master in January, 1996.
Lyon & Lyon vigorously disputes that
disqualification is proper in these
circumstances, particularly given the serious
prejudice to its client, Actel Corporation, if
this Motion is granted.

## I. SUMMARY OF THE ARGUMENTS

### A. QuickLogic

*2 Michael Oleinik was employed as a law
clerk by Skjerven Morrill during the summer
of 1994. Mr. Oleinik was briefed by the firm
that all work was confidential and executed a
confidentiality agreement on June 1, 1994.
On June 9, 1994, Mr. Oleinik was requested
by Ms. Alexandra Horne to do a research
project on this *Actel v. QuickLogic* case. Mr.
Oleinik did the assignment, prepared a

memorandum for Ms. Horne and recorded 2
hours of time in his time log for the *Actel v.
QuickLogic* case which included his
handwritten entry "... reading the case file."

Mr. Oleinik was employed as a lawyer by
Lyon & Lyon a year later, in September, 1995,
and was assigned to work on the *Actel v.
QuickLogic* case at that time. While Skjerven
Morrill knew that Mr. Oleinik had gone to
work for Lyon & Lyon, Skjerven Morrill did
not know that he had been assigned to this
case until Skjerven Morrill attorneys saw Mr.
Oleinik at a conference with the Master on
January 30, 1996. On January 31 Skjerven
Morrill notified Lyon & Lyon of QuickLogic's
concerns about the apparent conflict of
interest.

QuickLogic argues that this patent
infringement case is critical and threatens the
continued existence of the company; that
QuickLogic has great concern regarding the
dissemination, either consciously or
unconsciously, about the dissemination of its
confidential information about this case which
was communicated to him by Skjerven Morrill
attorneys and which was included in the case
file which Mr. Oleinik apparently read while
working as a clerk at Skjerven Morrill.
QuickLogic argues that under the law Lyon &
Lyon had the responsibility to assure that Mr.
Oleinik had not worked on this case and had
not been exposed to QuickLogic confidential
information while working as a clerk there
before assigning him to the case at Lyon &
Lyon. If Lyon & Lyon had made the
telephone call to check those facts it would
have learned that Mr. Oleinik had worked on
the case and screened him with a "cone of
silence" as required by law. Lyon & Lyon did
not assure itself that Mr. Oleinik had not
worked on the case and not only did not screen
him, they assigned him directly to work on
this case.

QuickLogic argues that it realizes the
harshness of disqualification, but that Lyon &
Lyon created the problem and no other
remedy will protect the rights of QuickLogic.

### B. Actel Corporation

Not Reported in F.Supp.
(Cite as: 1996 WL 297045, *2 (N.D.Cal.))

Page  3

Actel argues that QuickLogic's motion should be denied for several reasons: 1) there is simply no conflict, no facts and no legal theory which would justify disqualification; 2) QuickLogic has failed to carry its initial burden of establishing that Mr. Oleinik ever received any QuickLogic confidential information while working at Skjerven Morrill and thus there is no conflict; 4) Actel corporation would suffer extreme prejudice if it were stripped of its chosen attorneys at this stage of the proceeding; 5) Mr. Oleinik, when employed by Skjerven Morrill was not a lawyer and did not, and could not, "represent" QuickLogic, so the standard to be applied in determining whether there is a conflict of interest to warrant the disqualification of Actel's longstanding patent lawyers is that of a non-lawyer; 6) The fact that Mr. Oleinik later became a lawyer does not change the standard to be applied. *Allen v. Academic Games Leagues of America, Inc.,* 831 F.Supp. 785 (C.D.Cal.1993).

*3 Actel argues that under legal theory applicable to warrant disqualification under the non-lawyer standard, QuickLogic must first establish that Mr. Oleinik actually received confidential information material to the current proceeding; if that is not established, there is no conflict and disqualification is not warranted. If QuickLogic establishes that Mr. Oleinik actually received confidential information material to the current proceeding, even then disqualification is not automatic. Under those circumstances, this Court must determine whether Mr. Oleinik disclosed those confidences to Lyon & Lyon, or that Mr. Oleinik is likely to reveal to that confidential information. If the confidences have not been revealed and it is not likely that the confidences will be revealed, disqualification is not warranted.

Actel urges that QuickLogic has not established that Mr. Oleinik actually received confidential information and cannot establish this fact because as evidenced by Mr. Oleinik's declaration, he never received any QuickLogic confidential information, much less any QuickLogic information material to the current proceeding.

Actel also argues that even assuming that Mr. Oleinik received QuickLogic confidences, this Motion still should be denied because Mr. Oleinik's two hours of work that was billed to QuickLogic, related to basic research concerning an issue of this case that was resolved at least 18 months ago, well prior to Mr. Oleinik's employment at Lyon & Lyon; that issue dealt with whether the Court should stay this litigation pending the outcome of the reexamination of Actel's patents. Thus, to the extent that Mr. Oleinik could even conceivably have actually received QuickLogic confidential information, that information is not "material to the current proceeding." The case has evolved well past those peripheral and procedural issues to a point where those issues are no longer material to this proceeding.

Actel urges that QuickLogic has waived its rights to bring this motion, by failing to raise the issue when one of the original Skjerven Morrill attorneys of record in this case was informed that Mr. Oleinik was considering employment with Lyon & Lyon in October, 1994. Actel urges that Skjerven Morrill attorney had a duty to warn Lyon & Lyon at that time that Mr. Oleinik had been exposed to QuickLogic confidential information in his employ at Skjerven Morrill; or that Ms. Horne, who had given Mr. Oleinik that assignment at Skjerven Morrill should have warned Lyon & Lyon when she saw Mr. Oleinik working in Lyon & Lyon's San Jose office in September, 1995.

Finally, Actel asserts that the facts surrounding the bringing of this Motion lead to the conclusion that the filing of this motion is not about protecting QuickLogic's information, but rather as retaliation for Actel's successful motion for sanctions and as a litigation tactic to cause extreme financial burden on Actel and further delay this case.

II. FACTS

A. Facts Not in Dispute

Not Reported in F.Supp.
(Cite as: 1996 WL 297045, *4 (N.D.Cal.))

Page 4

**\*4** Many of the facts relevant to this Motion are not in dispute:

1. In the spring of 1994, Michael Oleinik had just completed his second year at Pepperdine University School of Law. On approximately June 1, Mr. Oleinik began a temporary summer clerkship at Skjerven Morrill which ended on approximately August 10, 1994. Oleinik ¶ 5. [FN1]

> FN1. Throughout this Recommendation a name followed by a "¶" refers to the paragraph of the person's declaration and a name followed by "Tr." refers to the "page:line" of the person's deposition transcript.

2. During Mr. Oleinik's employment at Skjerven Morrill, he performed general legal research on a variety of topics and was given some patent prosecution assignments. Oleinik ¶ 7.

3. On January 20, 1994 Actel filed suit against QuickLogic for the alleged infringement of four Actel patents: U.S. Patent No. 4,758,745, U.S. Patent No. 4,873,459, U.S. Patent No. 5,055,718, and U.S. Patent No. 5,198,705. On February 10, 1994, QuickLogic answered Actel's complaint, denying Actel's allegations of infringement.

4. By the summer of 1994, when Mr. Oleinik was employed by Skjerven Morrill, QuickLogic and its counsel were involved in discovery and the development of strategies for the long-term management of this litigation. MacPherson ¶ 2.

5. On April 19, 1994, QuickLogic filed requests for reexamination with the Patent and Trademark Office ("PTO") of two of the four Actel patents-in-suit: U.S. Patent No. 4,758,745 (the " '745 patent") and U.S. Patent 4,873,459 (the " '459 patent). At almost the same time, on April 18, 1994, QuickLogic served its Motion to Stay Proceedings Pending Reexamination of Patent. The Court denied QuickLogic's motion on May 20, 1994. In response, on June 7, 1994, QuickLogic filed a Motion to Reconsider QuickLogic's Motion to Stay Proceedings Pending Reexamination of Patents. On July 20, 1994, the Court granted QuickLogic's motion and the litigation was stayed.

6. It was in this time frame, on June 9 and 10, 1994, that Alexandra J. Horne, an associate with Skjerven Morrill, met with Mr. Oleinik to discuss the litigation. Horne ¶ 2.

7. Mr. Oleinik's and Ms. Horne's time sheets reflect these conferences, as does the July 1, 1994 billing invoice to QuickLogic. Specifically, on June 9, 1994, Mr. Oleinik's timesheet recorded in his own handwriting states: "discussion with Alexandra on ..., reading of case file." MacPherson ¶ 3.

8. Consistent with Ms. Horne's practice of discussing research assignments with associates, Ms. Horne declared that she would have discussed the details of the litigation and the rationale behind QuickLogic's strategy with Mr. Oleinik. Horne ¶ 3. Ms. Horne does not now have a recollection that she did in fact have this discussion with Mr. Oleinik. Horne Tr. 21:21-22:3.

9. In the summer of 1994 the *Actel v. QuickLogic* case file contained notes and correspondence regarding witnesses, reexamination, and technical analyses of the four Actel patents initially asserted against QuickLogic and other privileged communications. MacPherson ¶ 10.

10. Mr. Oleinik completed his clerkship at Skjerven on approximately August 10, 1994. Oleinik, ¶ 32.

**\*5** 11. In August, 1994, as part of his job search for a full-time position after graduating from law school, Mr. Oleinik sent his resume to Lyon & Lyon. On October 4, 1994, Mr. Oleinik interviewed in Lyon & Lyon's San Jose office with Messrs. Steven Hemminger and Jeffrey Miller, counsel for Actel in the *Actel v. QuickLogic* case. Both Mr. Hemminger and Mr. Miller asked Mr. Oleinik if during his clerkship at Skjerven Morrill he had worked on *Actel v. QuickLogic,* or any other projects involving QuickLogic. Hemminger ¶ 4; Miller ¶ 2.

12. Mr. Oleinik told both Messrs. Hemminger and Miller that he had no recollection of having worked on the *Actel v. QuickLogic* case. Hemminger ¶ 4; Miller ¶ 2; Oleinik ¶ 28.

13. On September 15, 1994, Mr. Oleinik received an offer of permanent employment from Skjerven Morrill in a letter signed by

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1996 WL 297045, *5 (N.D.Cal.))

Mr. Anthony deAlcuaz, a partner at Skjerven Morrill who originally was an attorney of record in this litigation Miller ¶ 12, 13, 14, Oleinik ¶ 27. Shortly after receiving this offer, Mr. Oleinik telephoned Mr. de Alcuaz to discuss whether Skjerven Morrill would keep its offer open longer so that Mr. Oleinik could consider employment offers from other firms, including employment at Lyon & Lyon in its San Jose office. Oleinik ¶ 27. Mr. de Alcuaz said nothing to Mr. Oleinik about any potential conflicts because Skjerven Morrill represented QuickLogic, and Lyon & Lyon represented Actel, in this case. Nor did Mr. de Alcuaz caution Mr. Oleinik in this phone call that he had ever been exposed to QuickLogic confidential information. Oleinik ¶ 27.

14. Neither Mr. de Alcuaz nor anyone else from Skjerven Morrill contacted Lyon & Lyon to discuss the possibility that hiring Mr. Oleinik could raise any conflict issues. Hemminger ¶ 11.

15. On October 13, 1994, Lyon & Lyon extended an offer to Mr. Oleinik and on October 14, 1994, Mr. Oleinik sent a letter to Mr. de Alcuaz at Skjerven declining its offer. Oleinik ¶ 28. In this letter, Mr. Oleinik specifically stated that he would be working at Lyon & Lyon's San Jose office. After receiving this letter, neither Mr. de Alcuaz, an attorney of record at one time in this case, nor anyone else from Skjerven Morrill attempted to contact Mr. Oleinik to inform him of any potential conflict issues raised by his employment with Lyon & Lyon. Oleinik ¶ 30. Further, neither Mr. de Alcuaz nor anyone else at Skjerven Morrill contacted Lyon & Lyon to discuss a conflict issue. Hemminger ¶ 11.

16. Mr. Oleinik began working at Lyon & Lyon's San Jose office on September 6, 1995. Oleinik ¶ 32. When Mr. Oleinik started, Lyon & Lyon again confirmed with Mr. Oleinik that he did not do any work for QuickLogic while clerking for Skjerven Morrill. Lyon & Lyon also confirmed that Mr. Oleinik did not receive any QuickLogic confidential information. Hemminger ¶ 5; Oleinik ¶ 32. At Lyon & Lyon's request, Mr. Oleinik wrote a confirming memorandum to file. Oleinik ¶ 32.

*6 17. Since working at Lyon & Lyon, Mr. Oleinik's involvement in this litigation has been limited. He aided Actel's attorneys in collecting documents for production to QuickLogic, reviewed those documents for privilege, drafted a motion to compel the production of documents and aided in the drafting of a motion for sanctions related to the motion to compel.

18. This lawsuit has evolved and accelerated in scope, pace and intensity since the summer of 1994.

19. While Mr. Oleinik was not effectively screened from *Actel v. QuickLogic* when he was hired by Lyon and Lyon. In fact, he was assigned to the case, he has been effectively screened from the case since February 6, 1996. Oppn. Exb. J.

B. Facts In Dispute

These facts are in dispute:

1. *Whether Mr. Oleinik was advised by Skjerven Morrill that he would be exposed to confidential information in his work as a law clerk.*

Actel argues that Skjerven Morrill never advised Mr. Oleinik that he would be exposed to confidential information during his clerkship, relying first on Mr. MacPherson's inability to recall any communications with Mr. Oleinik during the summer of 1994. MacPherson Tr. 21:24-22:2;   and on Mr. Oleinik's declaration:
"To my recollection, nothing I received from Ms. Horne was marked confidential or attorney-client privileged and Ms. Horne never indicated to me that anything she told me was confidential or privileged".   Oleinik Decl. ¶ 15.

QuickLogic asserts that Mr. Oleinik was advised when he began employment as a law clerk that everything he did at Skjerven Morrill was confidential and that Mr. Oleinik executed the firm's form of confidentiality agreement on June 1 1994.   Reply, Exb. E. [FN2]

FN2. Actel's Motion to Strike the Skjerven Morrill written confidentiality agreement as new matter first

Not Reported in F.Supp.
(Cite as: 1996 WL 297045, *6 (N.D.Cal.))

Page  6

submitted in QuickLogic's Reply is denied on grounds that the memorandum was submitted in rebuttal to Mr. Oleinik's assertion in the Opposition that he had never been briefed about confidentiality at Skjerven Morrill.

*2. Whether Mr. Oleinik was exposed to QuickLogic confidential information at Skjerven Morrill.*

QuickLogic argues that it is virtually impossible for Mr. Oleinik in the two hours he recorded on the *Actel v. QuickLogic* assignment to have met with Ms. Horne, had the background and litigation strategy of this litigation explained to him, read the QuickLogic "case file", done the research and written a legal memorandum. There simply would have been too much file to digest estimated in June 1994 to include no less than 29 papers on file with the court constituting a stack nearly six inches high, (Miller ¶ 16). Including the background of the litigation since May 1991 and the file histories of the four patents-in- suit and the reexamination proceedings the case file was a stack well over three feet high. (Miller ¶ 17).

Further, Actel argues that no one has ever saw Mr. Oleinik reading the QuickLogic case file. (MacPherson Tr. 38:13-21; Horne Tr. 23:2-5), and as Mr. Oleinik explains in his declaration, the reference to "reading the case file" in his time sheets does not refer to a QuickLogic litigation file but to a file folder with reported court cases in it that he recalls Ms. Horne gave to him. (Oleinik ¶ 10, 13). Mr. Oleinik declares that he never even knew that a QuickLogic case file existed. (Oleinik ¶ 13).

*7 QuickLogic argues that Mr. Oleinik's recollection of the facts about his work at Skjerven Morrill is not credible. Mr. Oleinik wrote in his September 13, 1995 memo to Mr. Hemminger that "... to the best of my recollection, I never performed any tasks with respect to that (QuickLogic) representation, nor do I have any recollection of any aspect of that representation whatsoever" (Reply, Exh. A). Mr. Oleinik told Mr. Hemminger and Mr. Miller on two occasions, when interviewed for the position at Lyon & Lyon and then after he

was hired that he had no recollection of having worked on the QuickLogic case. Hemminger ¶ 4, 5;  Miller ¶ 2, 3.

Then in his declaration Mr. Oleinik recalled that Ms. Horne had given him a file folder containing reported court opinions and asked him to investigate an issue with regard to those reported cases in the file.  Oleinik, ¶ 10. This is the "case file" that Mr. Oleinik says he meant with reference to having "read the case file" on his time sheet Oleinik, ¶ 25.    Mr. Oleinik also recalled in his declaration that his conversation with Ms. Horne was extremely short and that Ms. Horne did not provide any details about this litigation to Mr. Oleinik when giving him the assignment. Oleinik, ¶ 10.    In fact, to the best of his recollection, Ms. Horne did not even tell him that this assignment was for QuickLogic. Oleinik, ¶ 16.

QuickLogic argues that Mr. Oleinik's declaration is totally inconsistent with his multiple affirmation to Lyon & Lyon of having no recollection of having worked on the *Actel v. QuickLogic* case, of the written memorandum he prepared in the case and the written time record that he had worked on the case and "... read the case file."

C. Findings of Fact as to the Disputed Facts

As to the facts which are in dispute, paragraph III(B) above, the Special Master finds that:

1. The execution of the Skjerven Morrill confidentiality agreement by Mr. Oleinik on June 1, 1994 (Reply, Exh. E) is conclusive evidence that he was briefed and understood that his all his work as a law clerk at the firm was confidential.

2. The discussion Mr. Oleinik had with Ms. Horne, the written memorandum prepared by Mr. Oleinik in the *Actel v. QuickLogic* case, his written time record of having "read the case file", the fact that the case file in the summer of 1994 included substantial information which was confidential to QuickLogic, establish a preponderance of circumstantial

Not Reported in F.Supp.
(Cite as: 1996 WL 297045, *7 (N.D.Cal.))

Page   7

evidence that Mr. Oleinik was exposed to, and now possesses QuickLogic confidential information.

## III. THE APPLICABLE STANDARD.

In the exercise of judicial scrutiny of this Motion, this Court must consider these significant interests:

1. The right of Actel Corporation to counsel of its choice;

2. Lyon & Lyon's interest in representing its client, Actel;

3. The financial burden on Actel if this Motion to Disqualify is granted;

4. Whether litigation tactical abuse underlies filing of this Motion;

*8 5. The right of Mr. Oleinik to change employment and move freely in the employment community.

While these factors must be considered in applying the standards for disqualification, in order to "prevent literalism from possibly overcoming substantial justice to the parties" the most important consideration must be the preservation of the public trust in the scrupulous administration of justice and integrity of the bar. That trust can only be maintained by preserving client confidences. Ultimately, Actel's right to counsel of its choice must yield to considerations of ethics which run to the very integrity of our judicial process. See *In Re Complex Asbestos Litigation,* 232 Cal.App.3d 572, 586; 283 Cal.Rptr. 732 at 739-40 (Cal.App. 1st Dist.1991).

The *Asbestos* case provides an excellent summary of applicable California law on motions for disqualification. The case is controlling in situations where a nonlawyer employee moves from one firm to another when the two firms are litigating the same case, as occurred here when Mr. Oleinik became employed by Lyon & Lyon in September of 1995 after having been employed by Skjerven Morrill as a law clerk during the summer of 1994.

But the *Asbestos* case can be distinguished in two significant ways:

1. In *Asbestos* the nonlawyer employee, Vogel,

was engaged in much more aggressive conduct as a paralegal in searching Brobeck's files and computer systems about the asbestos cases before he moved to the Harrison firm; his conduct was substantially more egregious than occurred here;

2. However, the personal status of Mr. Oleinik in the context of this case is more troublesome than that of the paralegal in *Asbestos.* While Mr. Oleinik was a nonlawyer when employed as a law clerk by Skjerven Morrill, he was a lawyer when Mr. Oleinik was questioned by members of Lyon & Lyon whether he had worked on the *Actel v. QuickLogic* case while at Skjerven Morrill.

Every lawyer has the duty to uphold the integrity of the judicial process. Even though Mr. Oleinik was a nonlawyer when he worked at Skjerven Morrill, he was a lawyer charged with that duty at the time of the most critical event which triggered this Motion: when he accepted assignment at Lyon & Lyon to work on the *Actel v. QuickLogic* case. Given the intense litigation atmosphere in this locale today and the difficulty conflict-of-interest problems pose for all law firms, no lawyer can safely have such a dim recollection of his past work as Mr. Oleinik had in this case. Cf. *Allen v. Academic Games Leagues of America* (C.D.Cal.1993) 831 F.Supp. 785 (while finding it could not apply lawyer standard under rules of professional conduct to non-lawyer member who later became a lawyer, court nonetheless disqualified him and his law firm based on breach of fiduciary duty because despite "loophole" in the rules there was a failure to uphold the integrity of bar).

Notwithstanding the serious concerns that this situation raises, because Mr. Oleinik was a non-lawyer when exposed to the QuickLogic confidential information at Skjerven Morrill, the more stringent test for disqualification of non-lawyers set forth in *Asbestos.* [FN3] See *Allen v. Academic Games Leagues of America* (C.D.Cal.1993) 831 F.Supp. 785. That test is as follows:

FN3. Since the Special Master recommends that Lyon & Lyon be disqualified, no further analysis of

Not Reported in F.Supp.
(Cite as: 1996 WL 297045, *8 (N.D.Cal.))

Page   8

the "substantial relationship" test which is applied to lawyers is made. Because the "substantial relationship" test creates a conclusive presumption that the attorney possesses confidential information of the former client, the attorney test for disqualification is more easily met than the requirement of having to show actual access to confidential information for the non-lawyer under *Asbestos.*

**\*9** The party seeking disqualification must show that its present or past attorney's former employee possesses confidential attorney-client information materially related to the proceedings before the court. [footnote omitted] The party should not be required to disclose the actual information contended to be confidential. However, the court should be provided with the nature of the information and its material relationship to the proceeding. [citation omitted].... Once this showing has been made, a rebuttable presumption arises that the information has been used or disclosed in the current employment.... To rebut the presumption, the challenged attorney has the burden of showing that the practical effect of formal screening has been achieved. The showing must satisfy the trial court that the employee has not had and will not have any involvement with the litigation, or any communication with attorneys or coemployees concerning the litigation, that would support a reasonable inference that the information has been used or disclosed. If the challenged attorney fails to make this showing, then the court may disqualify the attorney and law firm.
*Asbestos,* 232 Cal.App.3d at 596.

IV. CONCLUSIONS OF LAW

A. QUICKLOGIC HAS MET ITS BURDEN THAT LYON AND LYON POSSESSES QUICKLOGIC CONFIDENTIAL INFORMATION.

Under the standard for non-lawyers set forth in *Asbestos* it cannot be conclusively presumed that Mr. Oleinik was exposed to QuickLogic confidential information at Skjerven Morrill. It is QuickLogic's burden to show that he

possesses confidential information materially related to these proceedings. Possession of the information can be shown without revealing the actual confidences by "competent evidence of the former employee's job responsibilities or participation in privileged communications." *Asbestos,* 232 Cal.App.3d at 596, fn. 13.

To this day Mr. Oleinik states that he has no recollection of having worked on the *Actel v. QuickLogic* case. In his declaration he denies vigorously that he was ever briefed on the *Actel v. QuickLogic* case and that he ever read the case file. He states that the only "case file" he ever saw was a "file of cases". [FN4] However sincere this may be, it flies in the face of the fact of his meetings with Ms. Horne to discuss the case, his assignment and preparation of a written memorandum for this case and a time record in his own handwriting showing he read "the case file". The case file as it existed at that time contained QuickLogic confidential information which is still relevant to this case. What appears to have occurred is that Mr. Oleinik has forgotten not only that he was briefed and did execute a confidentiality agreement but also that he did work on the *Actel v. QuickLogic* case at Skjerven Morrill. [FN5]

FN4. Even if Mr. Oleinik is correct in this recollection, such a "file of cases" would itself be confidential, showing the work product of Ms. Horne.

FN5. Skjerven Morrill's memories also are dim as to precisely what was said in meetings with Mr. Oleinik, and no one saw Mr. Oleinik read the *Actel v. QuickLogic* case file which included confidential information. In the face of the written record, however, this does not change the fact that Mr. Oleinik had actual, not merely hypothetical or potential, access to confidences. See *Asbestos,* fn. 13.

While the declarations of the parties to this motion are somewhat in conflict, QuickLogic has met its burden of showing by a preponderance of competent evidence that Mr. Oleinik is in actual possession of QuickLogic confidential information which is material to this case. Actel's argument that the

Not Reported in F.Supp.
(Cite as: 1996 WL 297045, *9 (N.D.Cal.))

confidential information in the file in the summer of 1994 is not material because the issues in the summer of 1994 have now been resolved is rejected. The test for materiality is met by Mr. Oleinick's having worked on this case. See *Asbestos.*

B. LYON & LYON HAS NOT REBUTTED THE PRESUMPTION OF SHARED CONFIDENCES.

*10 Absent written consent from QuickLogic, once Skjerven Morrill has established that Mr. Oleinik possesses QuickLogic confidential information materially related to the *Actel v. QuickLogic* case, a rebuttable presumption arises that the information has or will be disclosed in his present employment at Lyon & Lyon. To rebut the presumption Lyon & Lyon must show that the practical effect of formally screening Mr. Oleinik from the case has been achieved.

Mr. Oleinik has not been screened from the *Actel v. QuickLogic* case. In fact, he accepted an assignment from Lyon & Lyon to work on the case in September, 1995. His screening did not begin until February 6, 1996, after this matter arose.

C. AS THE HIRING LAW FIRM, LYON & LYON HAD THE RESPONSIBILITY TO PROTECT THE CONFIDENTIALITY OF QuickLogic ATTORNEY-CLIENT CONFIDENCES

While these facts are not in dispute, the parties do vigorously dispute which firm had the responsibility to protect QuickLogic confidential information in these circumstances. Recognizing the realities of faulty memories and the need for certainty in rules for disqualification in the not-uncommon situation of lawyers and nonlawyers moving between firms, the court in *Asbestos* put primary responsibility on the firm with the most knowledge and best able to protect against a conflicts of interest: the employing law firm. Under *Asbestos* only Lyon & Lyon had responsibility to prevent the compromise of QuickLogic confidential information. As the employing law firm, only Lyon & Lyon

had the knowledge that Mr. Oleinik would be assigned to the *Actel v. QuickLogic* case. Lyon & Lyon could not reasonably have relied on the simple denial of Mr. Oleinik that he had worked on the case for the very reason which occurred here: memories fade. If, before assigning Mr. Oleinik to the case, Lyon & Lyon had made a telephone call to Skjerven Morrill to confirm whether Mr. Oleinik had worked on *Actel v. QuickLogic,* or been exposed to QuickLogic confidential information this conflict would not have arisen: Mr. Oleinik would have been screened by Lyon & Lyon.

D. SKJERVEN MORRILL HAD NO DUTY UNDER CALIFORNIA LAW TO WARN LYON & LYON THAT MR. OLEINIK POSSESSED QUICKLOGIC CONFIDENTIAL INFORMATION.

Skjerven Morrill had no duty to warn Lyon & Lyon about protecting QuickLogic confidential information when it learned that Mr. Oleinik was going to work there. Skjerven could and did reasonably assume that Mr. Oleinik would be screened from the case until it learned otherwise at the January 30, 1996 hearing. ABA Informal Opinion 88-1526 does suggest that better practice for Skjerven Morrill might have been to contact Lyon & Lyon to warn about Mr. Oleinik's exposure to confidential information when it learned Mr. Oleinik was going to work at Lyon & Lyon. That would have been better practice between counsel who communicate more effectively than counsel in this case ever have but that advice is not a duty under the law in California.

E. EQUITABLE CONSIDERATIONS DO NOT JUSTIFY DENIAL OF THIS MOTION.

*11 In exercising its discretion with respect to a motion for disqualification, a court may properly consider the possibility that the party brought the motion as a tactical device. *Asbestos* at 599. Actel argues that this is the case here, particularly because this Motion was brought shortly after Actel's motion for sanctions against QuickLogic was granted by the Special Master.

The Special Master finds on the record before

Not Reported in F.Supp.
(Cite as: 1996 WL 297045, *11 (N.D.Cal.))

him that QuickLogic acted promptly on first learning that Mr. Oleinik was working on this case, and that the motion was brought in good faith. No evidence exists that this Motion was brought as a litigation tactic or for any reason other that to protect the rights of QuickLogic [FN6].

> FN6. After the Master submitted a Recommendation to grant sanctions to Actel, the parties agreed to resolve the matter without appeal of the Recommendation to the Court under such circumstances that QuickLogic and the Master believed the matter closed. QuickLogic's motion to strike all reference to the sanctions episode at the hearing of this Motion, Tr 105:14-21, is denied on the grounds that Actel had not agreed that the Recommendation, which is a public document, would be kept confidential if the matter were resolved without appeal to the Court.

Moreover, although it is true that Actel will be prejudiced substantially by the disqualification of its long-time counsel in the *Actel v. QuickLogic* case, the loss of services of knowledgeable counsel is the type of prejudice implicated in any disqualification motion and is not the type of extreme prejudice contemplated by the courts in denying a motion on those grounds. "Even if tactical advantages attend the motion for disqualification, that alone does not justify denying an otherwise meritorious motion." *Asbestos* at 599.

F. WHILE THE RECOMMENDATION IS TO GRANT THE MOTION TO DISQUALIFY LYON & LYON, THE FACTS OF THIS CASE DO NOT JUSTIFY THE EXTREME REMEDIES SOUGHT BY QUICKLOGIC.

QuickLogic seeks an Order disqualifying Lyon & Lyon from representing Actel Corporation in this case, prohibiting any Lyon & Lyon attorneys from communicating about the case with Actel attorneys or successor counsel, and requiring that all Lyon & Lyon work product since September 1995 to be destroyed. The *Asbestos* case provides no guidance as to the standards for consideration of remedies ancillary to a motion for disqualification. Nor does any other case in

the Ninth Circuit.

Only *First Wisconsin Mortgage Trust v. First Wisconsin Corporation*, 584 F.2d 201 (7th Cir.1978) (en banc) provides guidance here. In a wide ranging opinion the Court considers at length the appropriateness of access to pre-disqualification work product by successor counsel. The case can be distinguished from this case, but nonetheless articulates principles applicable here:
"(Citations omitted) The court then stated what we deem to be an important guiding principle in cases of the present try, namely, that 'disqualification in circumstances such as these where specific injury to the moving party has not been shown is primarily justified as a vindication of the integrity of the bar'. (Citation omitted) This again brings a differing focus to what we regard as disparate aspects of these cases: the disqualification, which when cause exists although having some impact upon the client, is primarily a sanction against the lawyer, which the prohibition of the turnover of the work product, created during the period subsequently determined to be a time of violation, but which has derived no advantage from the dual representation, such a would result from use of confidential information, causes the sanction to be imposed on the client not the lawyer.
*12 ... (W)e decline to apply the principle which ... urges that if there is disqualification there is per se taint denying the use of work product during the period of disqualification. To apply this inflexible rule would:
... destroy the work done by disqualified counsel, irrespective of any fault on the part of the party for whom the work was done;
... would do this regardless of whether the work destroyed involved the use of any confidential information obtained from the complaining party;
... would foreclose trial courts from any exercise of discretion in determining what effect an order of disqualification should have upon the parties to litigation;
... would seriously impede the administration of justice ... because ... it would for all practical purposes ... impose a moratorium upon trial preparation for such period of time

Not Reported in F.Supp.
(Cite as: 1996 WL 297045, *12 (N.D.Cal.))

as it might take to rule upon a motion for disqualification.;

... would do a major injustice to the clients of disqualified counsel, causing them to pay a second time for the same work;

... would encourage the public in its dissatisfaction with the expense and delay involved in the administration of the judicial system;

... would provide no benefit to the complaining party other than the satisfaction of imposing an unnecessary financial burden on its opponent;  and

... would in no way discipline disqualified counsel whose actions have been the cause of the disqualification order. *First Wisconsin Mortgage* 584 F.2d at 208-9.

These principles apply here.    Because a) QuickLogic has made no showing of special damage as a result of use of any confidential information;   b) the disqualification here is primarily a sanction against Lyon & Lyon and vindication of the integrity of the bar and the judicial process;  and c) Actel Corporation was not at fault in any way and destruction of work product would be a major injustice and financial burden to that company, the request of QuickLogic for destruction of work product and prohibition of communication with successor counsel and Actel attorneys should be denied.    Further, consistent with the principle of fairness and justice to Actel Corporation, the Court in exercise of its discretion should order that Lyon & Lyon be disqualified from the date of the Order and the Lyon & Lyon may turn over its files and offer assistance in the transition to successor counsel.

## V. RECOMMENDATION

For  the  reasons  stated  above  it  is recommended:

A.  That  the  Motion  of  QuickLogic  to disqualify Lyon & Lyon should be granted, effective the date of Order of this Court;

B.  That  to  minimize  prejudice  to  Actel Corporation,  Lyon  &  Lyon  should  be permitted to turn over its records and files and

provide  assistance  in  the  transition  to successor counsel.

### RELATED MOTIONS

1. Actel's Motion to Strike the confidentiality agreement executed by Mr. Oleinik (Tr. at 117) for the reason that the agreement is new matter submitted by QuickLogic in its Reply is denied.    The agreement was submitted to rebut Mr.  Oleinik's  affirmation  in  the Opposition that he had not been briefed about security matters by Skjerven Morrill.

*13 2. Actel's Motion for a Recommendation that this Motion, if granted, be certified for appeal (Tr. at 117) is denied.    Once the Recommendation on the Motion is filed, the Master is without further power with respect to the matter submitted.

3. Actel's Motion to Strike the reference in QuickLogic's Reply to Ms. Horne's June 21 time record (Tr. at 117-18) is granted.    See Horne Tr. 17:18-23.

4.  QuickLogic's  Motion  to  Strike  the Recommendation  concerning  sanctions (Opposition, Exh. G) is denied.   While it was the understanding of QuickLogic and Actel that the sanctions matter was closed, the Recommendation is a public record and Actel made to express agreement that it would not refer to the Recommendation or that it was confidential.

5. The Ruling of the Special Master Striking Declarations to QuickLogic's Motion for Disqualification was entered March 14, 1996. The Ruling struck declarations of attorney expert witnesses proposed to testify about the custom and practice of law firms in this area on the subject of this Motion.   The Ruling was entered:  1) to expedite pleading of this Motion by eliminating need for depositions of four experts, two for each party;   2) because the testimony of experts was not relevant to issues in this Motion, and 3) because in the opinion of the Master this Court is well able to determine this Motion based on the facts and applicable law without expert opinion.   It was provided in this Ruling that the matter was

Not Reported in F.Supp.
(Cite as: **1996 WL 297045, *13 (N.D.Cal.)**)

not a dispositive pre-trial discovery matter
and the while each party agreed not to appeal
the Ruling in the interest of expediting this
hearing, the Ruling could be appealed to the
Court at a later time *i.e.* in the filing of
objections to this Recommendation.

 Dated:  April 23, 1996

1996 WL 297045 (N.D.Cal.)

END OF DOCUMENT

Copr. ® West 2003 No Claim to Orig. U.S. Govt. Works

2

$EX$ $2$

Slip Copy
(Cite as: 2003 WL 21210115 (N.D.Ill.))
<KeyCite History>

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.

**Margaret M. PORTER, Plaintiff,**
**v.**
**FAIRBANKS CAPITAL CORP.,**
**Defendant.**

**No. 01 C 9106.**

May 21, 2003.

*MEMORANDUM OPINION*

GRADY, J.

**\*1** Before the court are several motions: (1) defendant's motion to dismiss Counts II-XI of the third amended complaint; (2) plaintiff's second motion to cite additional authority in opposition to defendant's motion to dismiss; (3) plaintiff's motion to strike defendant's reply brief or for leave to respond to new matter; and (4) defendant's motion to strike Exhibits D and F from the third amended complaint.

For the reasons explained below, defendant's motion to dismiss Counts II-XI of the third amended complaint is granted in part and denied in part. Plaintiff's second motion to cite additional authority in opposition to defendant's motion to dismiss is granted. Plaintiff's motion to strike defendant's reply brief or for leave to respond to new matter is denied. Defendant's motion to strike Exhibits D and F from the third amended complaint is granted in part and denied in part.

*BACKGROUND*

The facts of this case were described in our earlier opinion, and are as follows. Plaintiff, Margaret M. Porter, brings this action against defendant Fairbanks Capital Corp. ("Fairbanks"), alleging that Fairbanks engaged in unlawful debt collection and fraudulent mortgage servicing practices. [FN1]

FN1. Plaintiff's prior complaints were brought against CF Mortgage Service Company as well, but the third amended complaint is brought only against Fairbanks.

The third amended complaint alleges the following facts, which we take as true for purposes of this motion. In 1997, plaintiff obtained a mortgage loan to finance improvements on her home in Chicago. On April 1, 2001, plaintiff's loan was being serviced by CitiFinancial Mortgage Company ("CitiFinancial"). The servicing rights on plaintiff's loan were subsequently transferred to Fairbanks. Plaintiff's loan was in default at the time of the transfer of servicing; prior to the transfer, CitiFinancial had issued a notice of default to plaintiff.

On June 26, 2001, Fairbanks sent plaintiff a demand letter, which plaintiff alleges violates the Fair Debt Collection Practices Act ("FDCPA") because it did not contain certain required information. Plaintiff alleges that five days later, Fairbanks sent plaintiff a letter stating that her account had been forwarded to counsel for the institution of foreclosure proceedings. (However, the date of letter, which is attached as Exhibit E to the third amended complaint, is July 31, 2001). Around the same time, Fairbanks sent plaintiff a videotape entitled "Solutions for Today's Homeowners," which plaintiff claims violates the FDCPA.

Thereafter, Fairbanks accelerated plaintiff's loan and, in the name of its principal, filed a foreclosure action against plaintiff. After accelerating the loan, Fairbanks assessed late charges against plaintiff and continued sending monthly loan statements. After plaintiff filed the instant action in November 2001, the foreclosure proceeding was voluntarily dismissed with leave to reinstate once this case has been resolved. Plaintiff then attempted to reinstate her loan by wire transferring to Fairbanks an amount equal to all monthly payments from the last one that had been accepted by Fairbanks to that of the current month. But in order to reinstate the loan, Fairbanks also demanded attorney's fees

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

for the foreclosure proceeding, post-acceleration late charges, and property preservation fees and broker price opinion fees for services performed by an entity called "RR Review."

*2 The third amended complaint alleges violations of the FDCPA (Counts I, II, III, IV, VI, IX, and XI) and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act and its Pennsylvania counterpart (Count VIII). The complaint also seeks restitution (Count X) and declarations that the terms of plaintiff's note and mortgage prohibit Fairbanks from charging post-acceleration late charges (Count V) and from charging property preservation and broker price opinion fees (Count VII).

Fairbanks now moves to dismiss Counts II-XI of the third amended complaint and also moves to strike Exhibits D and F from the complaint. Also pending before us are plaintiff's second motion to cite additional authority in opposition to defendant's motion to dismiss [FN2] and plaintiff's motion to strike defendant's reply brief or for leave to respond to new matter.

> FN2. We previously granted plaintiff's first and third motions to cite additional authority in opposition to defendant's motion.

### DISCUSSION
Defendant's Motion to Dismiss Counts II-XI

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356, at 294 (2d ed.1990). When evaluating such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Hentosh v. Herman M. Finch Univ. of Health Sciences,* 167 F.3d 1170, 1173 (7th Cir.1999); *Jang v. A.M. Miller & Assocs.,* 122 F.3d 480, 483 (7th Cir.1997). Dismissal is appropriate only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." ' *Ledford v.*

*Sullivan,* 105 F.3d 354, 356 (7th Cir.1997) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)); *Jones v. General Elec. Co.,* 87 F.3d 209, 211 (7th Cir.), *cert. denied,* 519 U.S. 1008 (1996).

### A. Count II (Videotape)

Count II is a claim that the "Solutions for Today's Homeowners" videotape violated various subsections of § 1692e of the FDCPA. Section 1692e prohibits debt collectors from using "false, deceptive, or misleading" representations or means in connection with the collection of any debt. Fairbanks contends that Count II must be dismissed because the videotape did not demand that plaintiff make any payment and thus was not a communication in connection with the collection of a debt.

Fairbanks relies on *Bailey v. Security National Servicing Corp.,* 154 F.3d 384, 387 (7th Cir.1998), for the proposition that we should focus on whether the communication demands payment of a debt. In *Bailey,* the Seventh Circuit held that a letter informing the plaintiffs about the current status of an account and future due dates of payment, but not demanding any payment, was not a communication in connection with the collection of any debt. The court noted that the letter did not " 'demand' any payment whatsoever, but merely inform[ed] [plaintiffs] about 'the current status' of their account," that the due dates listed in the letter were all prospective, and that the letter did not "even imply that anything owed under [plaintiff's] forbearance agreement [was] overdue." 154 F.3d at 388-89.

*3 Here, the videotape that Fairbanks sent to plaintiff does not demand any payment whatsoever; it does not even inform plaintiff of the status of her account or future due dates. It does not provide any information at all about plaintiff's particular loan status. The videotape simply encourages borrowers to contact Fairbanks' Loan Servicing Center and suggests possible loan workout options. Because the videotape does not demand payment from plaintiff, it cannot be construed

as a communication in connection with the collection of debt. [FN3]

> FN3. In determining whether the videotape demands payment and thus falls under § 1692e, we are relying on Exhibit F to the Third Amended Complaint, which is a transcript of the videotape. Defendant has moved to strike Exhibit F on the basis that the transcript is biased in favor of plaintiff. Even if the transcript is biased (which we need not address), plaintiff fails to state an FDCPA claim based on the tape. Because we are dismissing Count II, the only claim in the complaint that is based on the tape, defendant's motion to strike Exhibit F from the complaint is denied as moot.

Plaintiff attempts to distinguish *Bailey* by suggesting that the case only involved certain subsections of § 1692e that are not applicable here. However, it is clear from both *Bailey* and the plain language of § 1692e that the requirement that a communication be in connection with the collection of a debt applies to every subsection of § 1692e. Plaintiff also contends that the videotape, because it followed Fairbanks' initial demand letter, was part of a "single, integrated course of collection conduct." (Response at 5.) Pursuant to *Bailey*, though, we must focus on the nature of the communication itself, not on defendant's "course of conduct." Section 1692e does not regulate a debt collector's "course of conduct"; rather, it pertains to specific communications.

Plaintiff fails to state an FDCPA claim based on the videotape; thus, Count II must be dismissed.

### B. Count III (Monthly Statements)

Count III is a claim based on defendant's failure to include certain debt collector disclosures [FN4] required by § 1692e(11) of the FDCPA on the monthly loan statements it sent to plaintiff. Fairbanks asserts that Count III must be dismissed because, like the videotape in Count II, the monthly statements do not demand payment and thus were not communications in connection with the collection of a debt as required by § 1692e.

> FN4. The FDCPA requires that initial communications from debt collectors include a notice that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose. Subsequent communications must include a notice that the communication is from a debt collector. 15 U.S.C. § 1692e(11).

We disagree. The monthly statements that Fairbanks sent to plaintiff, which are attached to the complaint as Exhibits G and H, clearly refer to "total late charges due" and therefore can be construed as communications in connection with the collection of a debt. As stated *supra*, however, we reject plaintiff's argument that all of Fairbanks' communications constitute a single course of conduct and that, once Fairbanks demands payment, all of its subsequent communications are intended to effectuate that purpose. We also note that Count III is the type of FDCPA claim about which the Seventh Circuit has observed: "The law would be best served by challenging clear violations [of the FDCPA] rather than scanning for technical missteps that bring minimal relief to the individual debtor but a possible windfall for the attorney." *Bailey*, 154 F . 3d at 388.

### C. Counts IV & v. (Late Charges)

The third amended complaint alleges that, in order to reinstate plaintiff's loan, Fairbanks required that plaintiff pay late charges with respect to months during which her loan was accelerated. Count IV alleges that Fairbanks violated §§ 1692e, 1692f and 1692f(1) of the FDCPA by assessing these late charges after plaintiff's loan was accelerated. [FN5] Count V seeks a declaration that Fairbanks is not entitled to collect post-acceleration late charges under the terms of the note or mortgage. Fairbanks argues that these claims must be dismissed because the express terms of plaintiff's mortgage documents permit such late charges to be assessed in the context of a reinstatement.

> FN5. Section 1692f prohibits debt collectors from using "unfair or unconscionable" means to collect or attempt to collect any debt, and § 1692f(1) prohibits "[t]he collection of any amount (including any

interest, fee, charge or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

*4 We agree with Fairbanks that plaintiff fails to state an FDCPA claim or a claim for declaratory relief based on late charges. Plaintiff's mortgage expressly conditions reinstatement on the Borrower's payment of "all sums which then would be due under this Security Instrument and the Note *as if no acceleration had occurred"* and the Borrower's curing of "any default of any other covenants or agreements."   [FN6]   (Third Amended Complaint, Ex. J, Mortgage, at 5 (emphasis added).)   Because the assessment upon reinstatement of late charges for months during which plaintiff's loan was accelerated is expressly authorized by the mortgage, plaintiff fails to state an FDCPA claim or a claim for declaratory relief, and Counts IV and V must be dismissed.

> FN6. Plaintiff argues that late charges can only be assessed with respect to monthly payments, which cease to become due when a loan is accelerated. This reasoning, however, fails to account for the phrase "as if no acceleration had occurred."

D. *Counts VI, VII & VIII (Property Preservation and Broker Price Opinion Charges)*

Count VI alleges that Fairbanks violated §§ 1692e, 1692f and 1692f(1) of the FDCPA by assessing amounts for "broker price opinions" and "property preservation services" performed by an entity called "RR Review." Count VII seeks a declaration that Fairbanks is not entitled to collect these charges under the terms of the note or mortgage. Fairbanks contends that Counts VI and VII must be dismissed because the express terms of plaintiff's mortgage documents permit Fairbanks to charge plaintiff for these services in the context of a reinstatement.

Plaintiff concedes that the mortgage documents permit Fairbanks to charge plaintiff for certain amounts:
  Protection of Lender's Rights in the Property.
  If Borrower fails to perform the covenants

and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, or condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs....
Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument.
  (Third Amended Complaint, Ex. J, Mortgage, ¶ 7.) Plaintiff contends, though, that the charges for RR Review's services violated the FDCPA and the terms of the mortgage for two reasons: (1) the broker price opinions were not "necessary to protect the value of the Property"; and (2) Fairbanks did not "disburse" amounts for RR Review's services because RR Review is simply a part of Fairbanks staffed by its own employees.

Fairbanks argues that broker price opinions are necessary to protect the value of the property. This contention goes to the merits of plaintiff's case, which is not at issue on a motion to dismiss. We believe that plaintiff adequately states claims in Counts VI and VIII on the theory that broker price opinion charges are not permitted because they do not protect the value of the property.

*5 However, we reject plaintiff's claims to the extent that she is alleging that any services performed by RR Review violated the FDCPA and the terms of her mortgage documents simply because they were performed by RR Review. Plaintiff hangs her hat on the word "disbursed" in paragraph 7 of the mortgage; according to plaintiff, amounts can only be "disbursed" to third parties, and RR Review is not a third party because it is affiliated with Fairbanks. We believe that this is a strained and unreasonable interpretation of the word "disbursed" that is considerably narrower

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

than even the dictionary definition of the word quoted in plaintiff's brief. The word is not restricted to amounts paid to non-affiliated third parties only, [FN7] and the context in which the word is used also does not imply this restriction on the defendant's right to charge a defaulting borrower for actions taken to protect the value of the property.

FN7. "Disburse" simply means to "expend" or "spend." *Webster's Third New International Dictionary* 644 (1971).

By the same token, plaintiff fails to state a claim in Count VIII for a violation of either the Illinois or Pennsylvania consumer fraud acts based upon the charges for RR Review's services. It would be one thing if plaintiff were claiming that RR Review never performed the services for which plaintiff was charged. But just because Fairbanks and RR Review are affiliated does not render the charges for RR Review's services "fraudulent." Therefore, Count VIII will be dismissed.

### E. *Count IX ("Recoverable Corporate Advances")*

Count IX is a claim that defendant violated § 1692e of the FDCPA by listing attorney's fees under the category of "recoverable corporate advances" but not under the category of "legal fees" on a document dated December 28, 2001. Pursuant to plaintiff's request, the document provided her with loan reinstatement figures. Plaintiff claims that it is deceptive and misleading to characterize $2,164.54 of attorney's fees as "recoverable corporate advances" when the item for "legal fees" read "$0.00." (Third Amended Complaint, ¶ 33 & Ex. K.)

Defendant does not argue that the amounts listed as "recoverable corporate advances" represented anything other than attorney's fees. However, defendant contends that Count IX must be dismissed because it was not misleading to characterize the fees as "recoverable corporate advances" for two reasons. One, defendant had in fact "advanced" these amounts to foreclosure counsel. Two, the category "legal fees" identifies only "those legal costs that have not

yet been paid and remain outstanding." (Reply at 14-15.) We reject defendant's argument, which really appears to be directed at the merits of plaintiff's claim. Defendant's interpretation of the phrase "legal fees" is not evident on the face of the document that was provided to plaintiff. At this point, we are only concerned with whether Count IX states a claim, and it does. Accordingly, the motion to dismiss is denied as to Count IX.

### F. *Counts X & XI (Attorney's Fees)*

*6 Count XI of the third amended complaint alleges that Fairbanks violated the FDCPA by "adding attorney's fees, legal fees, and related expenses" "to the borrower's account even though the sums have not been awarded, approved or authorized by any court." (Third Amended Complaint, ¶ 127.) Count X seeks restitution for, or cancellation of, those fees. Fairbanks contends that Counts X and XI do not state claims because the legal fees were authorized by the note and mortgage, and Illinois law does not prohibit a party from contractually assessing attorney's fees without a court award.

The note and mortgage in this case clearly authorize the assessment of reasonable attorney's fees incurred in relation to enforcing the mortgage documents. The note states, "If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees." (Third Amended Complaint, Ex. I, Note, ¶ 6(E).) The Mortgage provides that in the event of a default by the Borrower, the Lender may pay for whatever is necessary to protect the value of the property and Lender's rights in the property, including appearing in court and paying reasonable attorney's fees, and that these payments shall become additional debt of the Borrower. (*Id.*, Ex. J, Mortgage, ¶ 7.) In the section titled "Acceleration; Remedies," the mortgage also states: "Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in

this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence." (*Id.,* Ex. J, ¶ 21.)

Plaintiff does not dispute that the mortgage documents authorize reasonable attorney's fees, and she does not allege that the amount of fees were unreasonable. Rather, plaintiff's position is that the assessment of attorney's fees *without court approval* violates Illinois law and the FDCPA. However, plaintiff does not cite any authority that supports her argument. The Illinois cases cited by plaintiff merely stand for the principle that a party seeking to recover attorney's fees that are challenged as unreasonable bears the burden of demonstrating reasonableness. They do not stand for the proposition that Illinois law prohibits the imposition of attorney's fees, pursuant to a contract, without a court order. *See James v. Olympus Servicing, L.P.,* No. 02 C 2016, 2002 WL 31307540, at *3-4 (N.D.Ill. Oct. 9, 2002) (Grady, J.) (holding same).

Since the briefing on this motion was completed, plaintiff has brought three motions to cite additional authority in support of her argument. We have granted two of those motions, and plaintiff's second motion to cite additional authority is still pending. That motion is granted. However, none of the cases relied upon by plaintiff as "additional authority" bears upon the issue in this case. In *Shula v. Lawent,* No. 01 C 4883, 2002 WL 31870157 (N.D.Ill.Dec. 23, 2002), the plaintiff had received a letter from defendant, a debt collector, demanding the payment of court costs related to the collection of a debt for medical treatment. Plaintiff moved for summary judgment on his claim that the letter violated the FDCPA because the court costs were not expressly authorized by agreement, nor were they permitted by law. Defendants admitted that plaintiff had not entered into any agreement requiring him to pay court costs and that no judgment existed against plaintiff awarding court costs to defendant, but they argued that an Illinois statute permitted the collection of court costs.

*7 The court in *Shula* noted that the Illinois statute provided for the *possibility* of court costs

by stating that they were "recoverable," but the statute did not make it automatic every time the statutory requirements were met. The parties still had to request a court order imposing such costs. Therefore, the court concluded that the court costs demanded by defendant were not "permitted" by law under the FDCPA, and granted summary judgment for plaintiff on that claim. *Shula,* 2002 WL 31870157, at *10.

The instant case is easily distinguishable from *Shula.* There was no "agreement creating [a] debt" at issue in *Shula;* rather, the court was dealing with the "permitted by law" prong of § 1692f(1). Here, we have the note and mortgage. The only question, then, is whether the note and mortgage "expressly authorize" reasonable attorney's fees. They do; therefore, plaintiff cannot assert an FDCPA claim for attorney's fees, or seek restitution.

Plaintiff asserts that the Seventh Circuit's ruling in *Veach v. Sheeks,* 316 F.3d 690 (7th Cir.2003), controls this case. Plaintiff also relies on *Bernstein v. Howe,* IP 02-192-C-K/H, 2003 WL 1702254 (S.D.Ind. Mar. 31, 2003). Both cases are distinguishable because they do not address whether Illinois law or the FDCPA prohibits the assessment, without a court order, of attorney's fees that have actually been incurred, when they are expressly authorized by contract.

Plaintiff's claims in Counts X and XI for restitution and for violation of the FDCPA must be dismissed.

### Plaintiff's Motion to Strike Defendant's Reply Brief or for Leave to Respond to New Matter

Plaintiff moves to strike defendant's reply brief (to plaintiff's response to the motion to dismiss) or, alternatively, for leave to respond to new matter, asserting that Fairbanks included new matter in its reply brief and attached "unauthenticated and improper" documents. We believe that plaintiff's motion is in reality an improper surreply brief and constitutes plaintiff's attempt to have the last word. There is no reason to strike defendant's

reply brief because it fairly addresses matters raised in plaintiff's response and does not raise "new matter." Accordingly, plaintiff's motion to strike the reply brief or for leave to respond to new matter is denied.

### Defendant's Motion to Strike Exhibits D and F from the Third Amended Complaint

Defendant moves to strike two exhibits from the Third Amended Complaint. Exhibit D is fifty pages and consists of various complaints internet users have posted on internet sites regarding the practices of mortgage servicers, including Fairbanks. The complaint describes Exhibit D as "material on two Internet sites complaining about inaccurate servicing practices by Fairbanks." (Third Amended Complaint, ¶ 16.) Defendant argues that this material is irrelevant and constitutes hearsay.

Rule 12(f) of the Federal Rules of Civil Procedure governs motions to strike and provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." We agree with defendant that Exhibit D is immaterial matter. A great portion of the material does not even concern Fairbanks's servicing practices, but the practices of other companies. As for the material that does refer to Fairbanks, it has no indicia of reliability (the sources of many of the complaints about Fairbanks are not even identified) and is irrelevant to the facts alleged in the complaint. The material appears to have been attached to the complaint solely for the purpose of prejudicing defendant. Exhibit D therefore will be stricken from the complaint.

*8 Defendant also moves to strike Exhibit F from the complaint. Exhibit F is a transcript of the videotape discussed *supra*. Because we are dismissing Count II, which is the only claim to which the videotape is relevant, the motion to strike is denied as moot as to Exhibit F.

### CONCLUSION
For the foregoing reasons, defendant's motion to dismiss the complaint is granted in part and denied in part. Counts II, IV, V, VIII, X, and XI of the Third Amended Complaint are dismissed with prejudice. The motion is denied as to Counts III, VI, VII, and IX.

Plaintiff's motion to strike defendant's reply brief or for leave to respond to new matter is denied.

Defendant's motion to strike Exhibits D and F from the Third Amended Complaint is granted in part and denied in part. Exhibit D is stricken from the Third Amended Complaint. The motion is denied as moot as to Exhibit F.

The claims that remain are Counts I, III, VI, VII, and IX of the Third Amended Complaint.

This case is set for a status hearing on May 28, 2003, at 10:30 a .m., to discuss plaintiff's renewed motion for class certification, which is pending but has not been briefed.

2003 WL 21210115 (N.D.Ill.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

3

$EX \quad 3$

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1414232 (N.D.Ill.))
<KeyCite History>

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

**TY INC., Plaintiff,**
v.
**THE JONES GROUP, INC., Defendant.**

**No. 99 C 2057.**

Nov. 9, 2001.

*MEMORANDUM AND ORDER*

MANNING, J.

**\*1** Plaintiff Ty manufactures and sells a line of plush bean bag filled toys under the name "Beanie Babies." Defendant The Jones Group manufactures and sells "Beanie Racers," which are plush replicas of miniaturized NASCAR race cars. Ty claims that Jones' use of the word "Beanies" means that it engaged in trademark infringement, unfair competition and dilution.

The following motions are before the court: (1) Jones' motion for summary judgment; (2) Jones' motion to strike Ty's Local Rule 56.1(b)(3)(B) response; and (3) Ty's motion to strike portions of Jones' reply in support of its motion for summary judgment or alternatively, for leave to file a surreply. For the reasons set forth below, all of these motions are denied.

I. Background

A. Jones' Motion to Strike

Before the court turns to Jones' motion for summary judgment, it will consider Jones' motion to strike Ty's Local Rule 56.1 response. In essence, Jones claims that Ty's response does not admit or deny Jones' statements of material facts as required by the local rules and that it is therefore entitled to have its facts deemed admitted. Local Rule 56.1 requires the nonmovant to submit a concise

response to the movant's Local Rule 56.1(a) statement and controvert it with specific references to the materials relied upon. N.D. Ill. Local Rule 56.1(b)(3)(B). The response must admit or deny the allegations made by the movant. *See, e.g., Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir.1994).

It is true that Ty does not specifically use the terms "admit" or "deny" in its response. Ty also objects to a number of facts based on relevancy. However, Ty's response, for the most part, indicates that it "disputes" or "does not dispute" Jones' facts. The local rules do not require a party to use any magic words to effectively admit or deny facts in the opposing party's statement. Thus Jones' motion to strike is denied. The court will assume that Ty meant to deny disputed facts and to admit undisputed facts. If Ty's intent is unclear, the court will deem Jones' facts as admitted to the extent they are supported by the record.

B. Facts

The following facts are derived from the parties' extremely detailed Local Rule 56.1 statements and are undisputed unless otherwise noted. In 1993, Ty, began to sell plush toys called "Beanie Babies." Ty obtained U.S. Federal Trademark Registrations for its "Beanie Babies" and "The Beanie Babies Collection" marks but never registered the word "Beanie" alone. In 1997, 1998, and 1999, Ty licensed the "Beanie Baby" mark for use in McDonald's "Teenie Beanie Baby" promotion. Most but not all Beanie Babies are shaped like animals. Ty also sells "Beanie Buddies" and "Beanie Kids." Ty's "Beanie Babies" products are extremely popular and are among the top selling toys and collectibles in the United States. Each Beanie Baby item has a red heart-shaped hang tag bearing Ty's logo and costs between $5 and $7.

**\*2** Jones is a licensee of NASCAR and manufactures and sells plush toys under the name "Beanie Racers." Beanie Racers are shaped like race cars with the colors, corporate logos, and racing numbers that appear on actual NASCAR race cars. They cost

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1414232, *2 (N.D.Ill.))

approximately $12 and have a white rectangular hang tag with the Beanie Racers mark and information about the NASCAR race car corresponding to that Beanie Racer. At least some Beanie Racers have been displayed in stores alongside other NASCAR products. Beanie Racers are offered for sale by specialty and mass market retailers. Ty has received a letter from a customer asking Ty to replace her Beanie Babies and Beanie Racers.

Jones has filed an intent-to-use trademark application for the name "Beanie Racers." Both Beanie Babies and Beanie Racers are small, plush toys filled with plastic pellets and covered in velboa fabric. Jones has submitted testimony from professionals within the industry opining that no reasonable jury could find that Beanie Racers and Beanie Babies are similar. In contrast, Ty has proffered a nationwide toy survey finding that over 70% of those surveyed identified the words "Beanies" and "Beanie" with Beanie Babies and Ty, and Jones has submitted an affidavit taking issue with the methodology used in the Ty study.

The parties consented to proceed before Magistrate Judge Levin with respect to Ty's motion for a preliminary injunction against Jones preventing it from selling Beanie Racers. Magistrate Judge Levin granted Ty's motion and the Seventh Circuit affirmed. *Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891 (7th Cir.2001). Although Jones subsequently filed for bankruptcy, the automatic stay as to this case has been lifted.

## II. Jones' Motion for Summary Judgment

Before the court considers Jones' motion for summary judgment, it must first resolve Ty's motion to strike portions of Jones' reply memorandum or, alternatively, its motion for leave to file a surreply. Ty claims that Jones' reply memorandum improperly raised new arguments. The court agrees that a reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court. *See Edwards v. Honeywell, Inc.*, 960 F.2d 673, 674 (7th Cir.1992) (a court may not grant summary judgment on a ground raised for the

first time in reply).. However, a reply brief may and in fact should address the arguments raised by the other party. *Id* . Because Jones's reply brief did not present new legal theories or arguments, Ty's motion to strike is denied.

### A. Standard of Review

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing the summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading"; rather, it must respond with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) . "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir.1992), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Valenti v. Qualex, Inc.*, 970 F.2d at 365; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

*3 A likelihood of confusion is typically a question of fact, "but as with any question of fact, can be resolved on summary judgment if the evidence is so one-sided that there can be no doubt about how the question should be answered." *Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 83 F.3d 169, 171 (7th Cir.1996). Because the determination regarding the likelihood of confusion arising from Jones' use of the "Beanie Racers" mark is a finding of fact, the summary judgment standard is applied with added rigor. *Dorr- Oliver, Inc., v. Fluid-Quip, Inc.*, 94 F.3d 376, 380 (7th Cir.1996).

### B. Trademark Infringement

To prevail on a trademark infringement claim, a plaintiff must establish: (1) that its trademark is protectible; and (2) that there is

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

a likelihood of confusion as to the origin of the defendant's product. *Ty, Inc. v. The Jones Group, Inc.,* 237 F.3d at 897; *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 726 (7th Cir.1998). A mark is protectible if a "word, term, name, symbol, or device" specifically identifies or distinguishes one company's goods or services from competitors' goods or services. *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d at 726. In turn, likelihood of confusion is a shorthand way of referring to what happens when a competitor's subsequent use of a mark that is similar or identical to the plaintiff's mark causes consumers to think that the defendant's product is affiliated with or sponsored by the plaintiff. *See Ty, Inc. v. The Jones Group, Inc.,* 237 F.3d at 897; *Libman Co. v. Vining Industries, Inc.,* 69 F.3d 1360, 1361 (7th Cir.1996).

Ty contends that, though it does not hold a registered trademark for the word "Beanie," common-law trademark rights protect its use of the word "Beanie." In contrast, Jones asserts that it is improper to consider the word "Beanie" in isolation and that the words "Beanie Racers" and "Beanie Babies" when taken as a whole do not create a likelihood of confusion as to source. Because Jones' motion and supporting memorandum focuses on the likelihood of confusion, the court will assume that Ty's "Beanie" mark is protectible and will consider whether likelihood of confusion can be determined at the summary judgment stage.

Likelihood of confusion is evaluated in light of what occurs in the marketplace and from a consumers' perspective. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1115 (7th Cir.1997). To determine whether a likelihood of confusion exists, the court must consider seven factors: (1) the similarity of the marks; (2) the similarity of the products; (3) the area and manner of advertising use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiff. *Id.* No one factor is dispositive. *Id.* Instead, the court

must consider each factor on a case by case basis. *Id.* Here, factual disputes preclude the entry of summary judgment.

### 1. Similarity of the Marks

*4 Jones urges the court to compare the words "Beanie Babies" and "Beanie Racers" as opposed to focusing on its use of the word "Beanie" as part of its mark. However, "if one word or feature of the composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements. *Ty, Inc. v. The Jones Group, Inc.,* 237 F.3d at 898, *quoting Henri's Food Products Co., Inc. v. Kraft, Inc.,* 717 F.2d 352, 356 (7th Cir.1983). As the Seventh Circuit recently noted, because "[t]he word 'Beanie' is a well-known and famous part of the Ty mark," it is "the more salient portion of the mark and therefore deserving [of] greater weight." *Ty, Inc. v. The Jones Group, Inc.,* 237 F.3d at 899. Thus, the court will give the word "Beanie" greater weight than the surrounding words. *Id.*

When analyzing whether marks are similar, the court considers the sound, appearance, meaning, and connotation of each mark. *See S. Industries, Inc. v. Stone Age Equipment, Inc.,* 12 F.Supp.2d 796, 813 (N.D.Ill.1998). In addition, the court evaluates the marks as they are in the marketplace, as opposed to side-by-side. *Ty, Inc. v. The Jones Group, Inc.,* 237 F.3d at 898 . Here, Jones has failed to establish that the marks are different as a matter of law.

Ty's "Beanie Baby" marks and Jones' "Beanie Racers" mark both obviously contain the word "Beanie." It is true that Beanie Racers have white, rectangular hang tags with NASCAR information on them, as opposed to Ty's red heart-shaped tags. However, Ty sells additional products featuring the word "Beanie" such as "Beanie Buddies" and "Beanie Kids." Ty also authorized McDonald's "Teenie Beanie Babies" promotion. In light of Jones' use of the word "Beanie" in its mark and the number of other popular Ty "Beanie" items, a reasonable jury could find that the "Beanie Baby" and "Beanie Racers" marks are similar enough to cause a likelihood of

confusion regardless of the NASCAR information on the Beanie Racers' tags.

## 2. Similarity of the Products

Both Beanie Babies and Beanie Racers are plush, soft, pellet-filled toys covered with velboa fabric. Most but not all Beanie Babies are shaped like animals while Beanie Racers are shaped like NASCAR race cars. The test for analyzing the similarity of products is whether the products are the type that the public would attribute to a single source. *S. Industries, Inc. v. Stone Age Equipment, Inc.,* 12 F.Supp.2d at 814. Thus, minor differences that would clearly distinguish the products when placed side-by-side do not refute an inference of confusion in the marketplace. *Libman Co. v. Vining Industries, Inc.,* 69 F.3d at 1362.

Jones claims that this factor favors it, pointing to depositions taken from professionals within the industry to the effect that no reasonable jury could find that Beanie Babies are similar to Beanie Racers. The relevant audience for similarity, however, is customers and prospective customers. *Ty, Inc. v. The Jones Group, Inc.,* 237 F.3d at 900. Expert testimony as to what a jury might find is not enough to support the grant of summary judgment when the record shows that a reasonable jury could come to a different conclusion. Both Beanie Babies and Beanie Racers are small stuffed toys with a roughly similar size, fabric, and feel. Because the evidence is not one-sided enough to preclude a reasonable jury from finding that the products are so similar as to come from the same source, Ty is entitled to have a jury resolve this issue.

## 3. Area and Manner of Concurrent Use

*5 The area and manner of concurrent use factor requires the court to consider whether the use, promotion, distribution, or sales of the parties' products are related. *Ty, Inc. v. The Jones Group, Inc.,* 237 F.3d at 900. Relevant factors include the relative geographical distribution areas, the presence of any evidence showing that the products compete against each other, whether the products are

sold in the same type of store, whether the products are sold in a similar department of a particular store, and whether the product is sold through the same marketing channels. *Id.*

Here, both companies distribute their toys to specialty gift stores and department stores. In addition, both Ty and Jones have advertised their products in some of the same magazines, and both Beanie Babies and Beanie Racers are both marketed as collectibles. It is true that at least some Beanie Racers have been displayed in stores alongside other NASCAR products and that Beanie Racers are also sold by mass market retailers. However, this fact is not overwhelming enough to avoid a jury trial. The evidence shows that Beanie Racers were not always displayed with NASCAR collectibles, and that the marketing, advertising, and places of sale for Beanie Racers and Beanie Babies overlap at least to some degree. This factor thus turns on facts which the jury must determine.

## 4. Consumer's Degree of Care

The court next turns to whether it is likely that the relevant group of consumers will distinguish between Ty's products and Jones' Beanie Racers. *GAE, Inc. v. Clean Air Engineering,* - F.3d -, No. 00-3538, 2001 WL 1158967 * 17 (7th Cir. Oct. 2, 2001). Purchasers are generally more discriminating when they are selecting big ticket items. *Id.* If an item is low priced, the risk of confusion is greater. *Id.*

Beanie Babies are priced between $5 and $7, while Beanie Racers cost approximately $12. These are hardly the types of prices that would cause a consumer to agonize and conduct extensive pre-purchase research. Nevertheless, Ty's Beanie Babies have enjoyed wide success in the past few years and are a popular collector's item. Moreover, at least some Beanie Racers are purchased by NASCAR memorabilia collectors. Both of these groups are arguably relatively sophisticated. But, the record does not show that all or even most of the purchasers of Beanie Babies and Beanie Racers are this discerning because casual as well as

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1414232, *5 (N.D.Ill.))

sophisticated consumers buy Beanie Babies and Beanie Racers.

Hence, the evidence is not one-sided enough to cause a reasonable jury to conclude that all consumers who buy Beanie Racers and Beanie Babies are sophisticated enough to avoid a likelihood of confusion. Once again, this court cannot act as fact-finder so this issue cannot be resolved via a summary judgment motion.

5. Strength of the Mark

The strength of a mark refers to "its tendency to identify the goods sold under the mark as emanating from a particular ... source." *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 959 (7th Cir.1992). Trademarks are classified into the following categories: generic, descriptive, suggestive, arbitrary, and fanciful. *Id.* A generic mark is no more than the common descriptive term for the goods and is not protectible because it is incapable of designating the source of a product. *Technical Pub. Co., div. of Dun- Donnelley Pub. Corp. v. Lebhar-Friedman, Inc.,* 729 F.2d 1136, 1139 (7th Cir.1984). In turn, a descriptive mark is protectible if it has acquired secondary meaning, while suggestive and arbitrary marks are protectible. *Id.* Ty bears the burden of establishing that the term "Beanie" is not generic. *Id.*

**\*6** Ty contends that the Beanie mark is entitled to protection because is suggestive or arbitrary. Alternatively, it argues that the word Beanie is descriptive with an acquired secondary meaning. On the other hand, Jones contends that the Beanie mark is generic and that anyone may thus use the word "Beanie."

The record shows that Ty's Beanie Babies have been extremely successful for a number of years and have been featured extensively in the media and in web sites. But is the word "Beanie" merely a common descriptive term for bean bag toys? Ty points to a nationwide toy survey finding that over 70% of those surveyed identified the words "Beanies" and "Beanie" with Beanie Babies and Ty, while Jones takes issue with the methodology used in the Ty study. Th court finds that the word

"Beanie" is not purely descriptive and thus is not generic. *See Ty v. Perryman,* No. 99 C 8190, 2001 WL 826893 *9-11 (Jul. 17, 2001), *clarified by* 2001 WL 1223550 (N.D. Ill. Oct 12, 2001). In addition, the record shows that Ty's Beanie Babies mark is strong or, at the very least, that the precise strength of the mark is a material issue of disputed fact. Hence, this factor favors Ty.

6. Actual Confusion

Actual confusion is not necessary to establish that there is a likelihood of confusion. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d at 960. Moreover, isolated instances of actual confusion are generally not enough to establish a likelihood of confusion. *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d at 729. Ty asserts that consumers are confused, pointing to the letter it received from a customer who wanted Ty to replace her Beanie Babies and Beanie Racers. A Beanie Racer distributor testified that people thought that Beanie Racers were a Ty product. Given this evidence, the court cannot find that Jones has established as a matter of law that there is no actual confusion.

7. Intent to Palm Off Plaintiff's Goods

Proof that an entity meant to trade on another entity's good will goes to whether a plaintiff can establish a likelihood of confusion. *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d at 961. Here, Jones sought legal advice regarding its Beanie Racers product and thus claims that its hands are clean. In response, Ty points out that no evidence shows that Jones ever asked its lawyers if it could use (as opposed to register) the Beanie Racers mark. A jury, not the court, will have to resolve this issue.

In sum, after careful consideration of all of the likelihood of confusion factors, the court concludes that Ty has produced enough evidence to withstand Jones' motion for summary judgment. Because a reasonable jury could find that Jones' use of the name "Beanie Racers" is infringing, Jones' motion for summary judgment motion is denied.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

VI. Conclusion

For the reasons stated above, Jones' motion for summary judgment [195-1], Jones' motion to strike Ty's Local Rule 56.1(b)(3)(B) response [212-1], and Ty's motion to strike portions of Jones' reply in support of its motion for summary judgment [211-1] or alternatively, for leave to file a surreply [211-2] are denied. The final pretrial order is due by December 14, 2001. Motions in limine are due by November 26, 2001, responses are due by December 7, 2001, and replies are due by December 14, 2001. The court will not consider any untimely motions in limine. The pretrial conference shall be held on December 21, 2001 at 12:00 p.m. Trial will commence on January 2, 2002 at 10:30 a.m.

2001 WL 1414232 (N.D.Ill.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**4**

$EX \ 4$

1998 WL 30035
(Cite as: 1998 WL 30035 (N.D.Cal.))
<KeyCite Red Flag>

Only the Westlaw citation is currently
available.

United States District Court, N.D. California.

CSC CONSULTING, INC., Plaintiff(s),
v.
TOSCO REFINING COMPANY,
Defendant(s).

No. 96-00791 MHP.

Jan. 5, 1998.

MEMORANDUM AND ORDER

PATEL, J.

*1 Plaintiff CSC Consulting, Inc. ("CSC")
brought this claim against defendant Tosco
Corporation ("Tosco") alleging claims for
(counts 1-3) breach of three related contracts,
(4) fraud, (5) negligent misrepresentation, (6)
open book account, (8) quantum meruit and (9)
unjust enrichment, and (7) seeking a court-
supervised accounting.   Defendant Tosco
counterclaimed for (1) money had and received
and (2) breach of fiduciary duty.   Defendant
Tosco filed a motion for summary judgment
dismissing counts one through seven of CSC's
second amended complaint.   Now before the
court is defendant Tosco's motion for summary
judgment on CSC's claims. [FN1]

> FN1. CSC asks for summary judgment against
> Tosco in CSC's opposition to Tosco's motion for
> summary judgment.   CSC is correct that this court
> is authorized to grant summary judgment against
> Tosco, the moving party, even though CSC did not
> make a formal motion.   However, there is no
> provision in the court's rules that allows CSC to file
> a sur-reply in the form of a memorandum supporting
> its "motion."   This court strikes the two sur- replies
> submitted by CSC, and gives them no consideration
> in the disposition of this motion.

BACKGROUND [FN2]

> FN2. Unless otherwise indicated, the following facts
> are taken from the Joint Case Management Statement
> and Order filed December 9, 1996 and from the text

of documents incorporated by reference thereto and
attached to the pleadings.

Plaintiff and counter-defendant CSC
Consulting, Inc. is a wholly owned subsidiary
of Computer Sciences Corporation. CSC
Index is a business unit of CSC Consulting in
the business of management consulting. For
the purposes of this motion CSC Consulting
and CSC Index are the same and will be
referred to as CSC. Defendant and counter-
claimant Tosco Refining Company is a
division of Tosco Corporation. Tosco is in the
business of refining petroleum products which
are marketed through both retail and
wholesale systems.

During the first quarter of 1994 Tosco
interviewed several management consultants
and selected CSC to provide Tosco with
consulting services, the primary purpose of
which was to assess the possibility of
reengineering the procurement process at
Tosco's Avon refinery facility and to develop
an action plan. Tosco and CSC entered into
an initial agreement ("N415") in April 1994.
The scope of the N415 agreement was for CSC
to assess whether the benefits of
reengineering to Tosco were worth the costs
and difficulties. The length of the project was
two to three weeks and the total fees and
expenses were $15,000. CSC completed the
action called for under the N415 agreement
and was paid $15,000 for its fees and
expenses.

I.   The   N443   agreement   ("Procurement
Reengineering Project"), May-September 1994

Tosco and CSC entered a second agreement
("N443"), effective May 24, 1994. The key
elements of the N443 agreement were:  (1)
Tosco and CSC would jointly execute a four-
month project to reengineer the procurement
process at the Avon refinery;  (2) the financial
objectives of the project were to implement
programs and processes that would deliver
$20-25 million in bottom line benefits to Tosco
in the first year and $55-60 million in
sustainable annual savings by year three; and
(3) CSC's professional fees would be $220,000

per month, for four months, and costs were capped at ten percent of the professional fees ($88,000). *See* Def.'s Exh. C.

The N443 agreement appears to govern the entire relationship between the parties. Several relevant provisions are described below.

First, the agreement states that the Company Representative would be designated by Tosco in writing, and that CSC takes notice that the Company Representative has no authority with respect to the agreement other than that specified. *Id.* at 10136, ¶ 3.

**\*2** Second, the agreement states that CSC agrees that no payment made under the agreement, except the final payment, will be evidence of the performance of the agreement, and that no payment shall be construed as acceptance of defective work or "improper matters." *Id.* at 10136, ¶ 10.2.

Third, the N443 agreement provides the manner in which the project could be changed or the work increased subsequent to execution of the contract. It states that Tosco may, at any time, request CSC to make changes to the scope of the project or to provide additional work on the project. It states that CSC shall perform the change or extra work only after receipt of Tosco's agreement, in the form of a Change Order, based on CSC's proposal submitted in connection with the project. *Id.* at 10140, ¶ 23.1. Further, it states that if any request for a change or extra work causes an increase or decrease in the cost or the time required for performance of the project, or any change to the agreement, CSC shall submit in writing a proposal for accomplishing such change or extra work, and that such a proposal shall define, if applicable, any increase or decrease in cost or time of completion or other change to the agreement. If Tosco elects to have the Contractor perform the change or extra work, Tosco shall issue a Change Order to the agreement. *Id.*, ¶ 23.2. The agreement further states that Tosco shall not be liable for any costs incurred by CSC from performance of a change or extra work prior to issuance of a Change Order, unless expressly authorized in writing. *Id.*, 2 ¶ 23.3.

Fourth, the N443 agreement provides that in the event of delays or a need for an extension of time for any reason, existing or future, which is beyond the reasonable control and without the fault or negligence of CSC and which was not reasonably foreseeable by CSC at the time of entering the contract, CSC would give certain notices to Tosco within a specified time. It states that failure to comply with the notice requirements shall be sufficient ground for denial of an extension of time. Next, it provides that if Tosco determines that the delay satisfied the above conditions, Tosco would determine the impact of the delay and could extend the time of performance of the agreement accordingly. *Id.* at 10139, ¶ 18.

Fifth, the agreement provides for Tosco's right to suspend work or to terminate the agreement. Further, it provides that CSC shall have no claim for damages for any such suspension. *Id.* at 10138, ¶ 17.1.

Sixth, the agreement provides for the non-waiver of defaults. It states that Tosco's failure at any time to enforce or require the strict keeping and performance of any of the terms or conditions of the agreement, or to exercise a right under the agreement, would not impair or constitute a waiver of such terms, conditions, or rights. *Id.* at 10141, ¶ 30.

Seventh and perhaps most importantly, the N443 agreement contains an express integration clause which states that the agreement contains the complete agreement between the parties. It provides that in no event would the agreement include CSC's terms and conditions or other provisions submitted by CSC, unless explicitly agreed to in writing and signed by a duly authorized representative of the company. The agreement is explicit that all terms and conditions contained in work orders, purchase orders, proposals or other documents issued by CSC to Tosco with respect to the project and agreement will be of no force and effect and will be superseded by the terms of the agreement. Lastly, the clause provides the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**Page 3**

method for subsequent alteration of the
agreement: it can only be altered, amended,
or rescinded by a duly executed formal written
agreement executed by both parties. *Id.* at
10142- 43, ¶ 36.

*3 Eighth, the agreement provides a method
for later interpretation of the agreement in
the event of a conflict between any of its
provisions. It states that the agreement will
be interpreted based on an order of
precedence. *Id.* at 10130, ¶ 1. The list of
precedence is as follows:
Special Provisions [regarding insurance]
The Consulting Agreement [No. N00443]
General Conditions [including those terms
outlined above]
Exhibit "A"--Scope of Work
Exhibit "B"--Drawing List
Exhibit "C"--Materials List
Exhibit "D"--Codes and Specifications
Exhibit "E"--General Information for
Contractors Exhibit "F"--Compensation
Exhibit "G"--Contractor's Proposal [CSC
letter of May 18, 1994]

*Id.*

There are several provisions in the contract
which relate to terms of compensation. The
first such term, in the order of precedence,
appears on the first page of the "Consulting
Agreement" section of the N443 agreement.
*Id.*, ¶ 2. Under the title "Compensation," it
states that the complete compensation to be
paid by Tosco to CSC will be provided in
Exhibit "IF". *Id.* Exhibit "F" provides that the
cost of the work described in Exhibit A (Scope
of Work) will be $888,000.00 to be paid
monthly at $220,000.00, a less 10% retention.
Lastly, the clause provides that the expenses
will not exceed $88,000, and that the total
contract amount is $968,000. Id. at 10148.

Next, the first page of the "General
Conditions" defines the contract price as "the
total amount to be paid" CSC for all work
performed under the agreement. Further, it
states that the amount can be adjusted only by
the execution of a Change Order signed by
Tosco's duly authorized representative. *Id.* at
10136, ¶ 2.2.

The next provision relating to compensation
in order of precedence is Exhibit "A", entitled
"Scope of Work." *Id.* at 10144. This clause
provides the start and end dates of the
contract, names the company representative
as Bill McDaniel, and states that CSC would
furnish all labor, materials, equipment, and
other items of expense to required "to assist
Tosco in re-engineering the procurement
processes at the Avon Refinery per [CSC's]
proposal dated May 18, 1994, attached." *Id.*
Exhibit "G" provides that CSC's May 18
proposal was attached and incorporated into
the agreement without modification. *Id.* at
10149. CSC's proposal is contained in a four-
page letter dated May 20, 1994. Def.'s Exh. B
at 10092-95. In the letter, CSC proposes the
scope and timing of the project; short and
mid-term initiatives; staffing and roles;
arrangements for decision making--all issues
relating to the scope of work and the working
relationship and duties of the two companies
in executing the project. *Id.* In addition, on
the last page, the letter includes a proposed
provision for compensation, which reads:
Professional fees will run $220,000 per
month. 10% of those fees will be withheld
contingent upon achievement of 1994 targets.
These targets will be jointly determined
within the first three weeks of the project.
Tosco will be billed $198,000 per month, with
the contingent payment, if any, payable in
January of 1995. Within the first two weeks
of the project, a decision will be made on
whether a multiplier is applied to that
contingent ("performance bonus") based upon
achievement of targets in excess of the
minimums.

*4 *Id.* at 10095.

The parties dispute the terms of compensation
established by the N443 agreement. Tosco
contends that 10% of CSC's professional fees
for services rendered under the N443
agreement would be retained, contingent upon
achievement of 1994 targets which would be
determined within the first three weeks of the
project, resulting in billing to Tosco by CSC of
$198,000 per month with the contingent
payment (if any) payable in January 1995.
Further, Tosco contends that under the

agreement, a decision would be made within the first two weeks of the project whether a multiplier would be applied to the contingent payment based upon achievement of targets in excess of the minimums. Tosco contends that the contract never contained, and was never modified to contain, a multiplier or "bonus" provision. Tosco contends that the reference to CSC's May 20 proposal in Exhibit "A" (Scope of Work) referred to the work-related aspects of the proposal, not its proposed fee, and that the proposed fee contained therein was supplanted by the express provision for compensation contained in Exhibit "F".

On the other hand, according to CSC, the 10% of its professional fees which were retained and not billed were considered by Tosco and CSC to be "at risk" and the fees not billed were deemed to be CSC's investment in the project. CSC further contends that the parties agreed that if Tosco achieved a target level of benefits in reducing Tosco's procurement costs, CSC would be able to recoup the fees it had not billed, and if Tosco achieved even greater savings, Index could obtain a performance "bonus" based upon a multiplier. CSC contends that the formula for these targets and bonuses was agreed upon by CSC and Tosco by means of subsequent discussion and memorialized in a letter from CSC to McDaniel dated June 17, 1994.

In February 1995 Tosco paid CSC $165,446, $88,000 of which reflected CSC's 10% withheld professional fees, and $77,446 of which reflected a bonus payment. In all, CSC was paid $957,446 for professional fees and $61,826.10 for expenses, for a total of $1,019,272.10 under the N443 agreement. CSC contends that the total amount of fees was paid by Tosco pursuant to the agreement reached between the parties. Tosco contends that the bonus payment was "discretionary."

III. *First breach of contract cause of action, based on the N443 Agreement Extension, Change Order No. 1 ("Maintenance Reengineering Project"), October 1994 - March 1995*

CSC continued work on the procurement reengineering project. On or about October 25, 1994 CSC sent to Tosco a proposal to extend the N443 agreement to March 15, 1995, expanding its scope to include maintenance reengineering services and specifying the scope, timing, staffing, roles, facilities, support and expenses in connection with the proposed extension. Def.'s Ex. E. In addition, CSC proposed increasing the amount of CSC's professional fees "at risk" from 10% to 34%; thus, CSC would invoice Tosco for $1,072,500 in base fees, putting $550,000 at risk as an investment. In return for its investment in the project, CSC proposed that it be paid 20% of cumulative 1994 plus 1995 procurement benefits in excess of $16,900,000 and 20% of 1995 routine maintenance benefits. *Id.*

*5 Tosco contends that CSC did not propose this benefit source/calculation methodology in its October 25, 1994 proposal and that CSC did not propose such methodology to Tosco until July 25, 1995. CSC contends that its October 25 proposal was submitted after negotiating the terms and conditions of the extension, that the percentage of CSC's fees at risk would increase from 10% to 34%, and that the methodology of calculating benefits was the same as was employed in connection with the original N443 agreement.

On or about February 2, 1995 Tosco issued Change Order # 1, which authorized extension of the N443 agreement through March 15, 1995 "for additional consulting services not in the original Scope of Work for the Maintenance Reengineering project per [CSC's] proposal dated October 25, 1994 attached." Change Order # 1 further provided as follows: "All other terms and conditions of subject Agreement shall remain in full force and effect. The cost of this Change Order No. 1 shall not exceed the sum of [$1,234,750.00]. This increase is itemized as a fixed price of $1,072,500 plus a time-and-materials price of $162,250.00. Total cost of the above, including this Change Order No. 1, shall not exceed the sum of [$2,234,750.00]." Def.'s Exh. F.

The parties disagree as to the extent and effect of the written modifications and the

conduct and statements of the parties in
regard to Change Order No. 1. According to
Tosco, the parties did not agree to payment of
a bonus, or on the benefits that were claimed
to have been produced by CSC. Tosco contends
that by Change Order No. 1, Tosco agreed to
certain aspects of CSC's October 25 proposal,
but not to its proposal for a bonus, and left
said proposal subject to later negotiation.
Tosco contends that it agreed to extend the
N443 agreement through March 15, 1995 at
the agreed cost of $1,234,750 for Change
Order No. 1, and a total cumulative cost of
$2,234,750.   Tosco contends that on or about
March 10, 1995 CSC requested $2 million
from Tosco as needed before the end of its
fiscal year on March 31, as prepayment and
without prejudice to the issue of ultimate
liability.   Tosco contends that it paid CSC the
$2 million subject to refund.

According to CSC, on the other hand, Tosco
accepted CSC's October 25 proposal when it
signed Change Order No. 1. CSC contends
that Tosco's acceptance of the October 25,
1994 proposal was further evidenced by
Tosco's subsequent conduct and statements,
which were in conformity with the terms of
CSC's proposal. CSC contends that Tosco paid
CSC in accordance with the agreement
between the parties when Tosco paid CSC $2
million in March 1995, a sum which
represented 2/3 of the anticipated bonus.
CSC contends that the $2 million payment
was calculated as a return on CSC's
investment in accordance with CSC's October
25 proposal and was based on Tosco's
procurement savings as a result of CSC's
work.   CSC contends that the remaining $1
million was scheduled to be paid to CSC in
January 1996. CSC claims that the total fees
paid by Tosco to CSC pursuant to Change
Order No. 1 was $3,179,984, an amount in
excess of the alleged "cap" specified in Change
Order No. 1. CSC contends that all of these
sums were properly paid by Tosco under the
N443 agreement, as modified by Change
Order No. 1 and the conduct and statements of
the parties.   In addition, CSC contends that
Tosco breached the October extension
agreement by its refusal to pay CSC the
promised return on its investment, and that

Tosco thus owes CSC an amount in excess of
$4 million.

IV.  *Second-breach of contract cause of action,
based on N443 Agreement Extension, Change Order
No. 2, March--August 1995*

**6** On or about March 15, 1995 CSC proposed
continuing support of the Procurement
Maintenance Project past the scheduled
completion of the extended contract on March
17, 1995.   Def.'s Exh. H. In the letter, CSC
proposed the following:
[Tosco] will be billed only for expenses for the
period from March 17-March 31; professional
fees for that period will be considered
additional [CSC] investment.   The core team
will be provided at 1/2 professional fees, plus
all expenses at cost.   All other [CSC]
professional including the other half of the
core team costs, [CSC] senior management
time, and [additional services] will be
considered additional CSC Investment.   All
of the above fees and expenses will be
invoiced in total in January of 1996.   The
remaining contingent fees as outlined in our
arrangement letter of October 25, 1994, will
also be deferred until January of 1996.

*Id.* CSC thus contends that it increased the
percentage of its contingent investment to
50% of its professional fees, subsequent to
conversations between the parties and
memorialized in the above proposal letter.

On March 17, 1995 Tosco issued Change
Order No. 2. Def.'s Exh. I. Change Order No. 2
states only that it "will authorize extension of
[the N443] subject agreement through
January 31, 1996" and that "[a]ll other terms
and conditions of subject Agreement shall
remain in full force and effect." *Id.*

On July 25, August 1 and August 15, 1995,
CSC wrote to Tosco.   In each of the letters,
there is a statement that per the parties
conversations over the previous two months,
the letters outline the parties' agreement for
work through the end of the year.   In each of
the letters CSC identified the maximum fee it
proposed to charge Tosco and the extent of its
"investment" between the fee it proposed and

its "normal billing rates." [FN3] The August 15 letter states as follows:

FN3. The first two of these letters are not contained in the record, but the parties do not dispute the existence or contents of the letters.

Professional fees for August will not exceed $107,500; this fee level constitutes an approximately 70% investment by CSC Index. If we mutually determine that lower levels of support are required in August, we will prorate the fees downward accordingly. Professional fees for extensions of team members past August (excluding the Progress Checks) will be invoiced at 50% of our normal billing rates. Bill Yoh's support and all progress checks past August will be provided free of charge. Professional fee commitments and investment levels since March are summarized in attachment A.

Def.'s Exh. J. In an attachment to its letter, CSC summarized that its total "investment" from March to August 1995 amounted to $1,665,000. CSC's letter stated that "[a]s we agreed, the January 1996 contingent bonus payment will remain as originally outlined in October 25, 1994 arrangement letter, with the payout calculated based on the following benefit source/calculation methodology." CSC then listed a ten-criteria method of calculating cost savings and "value received" from various elements of the reengineering project on which to base the contingent bonus payment. *Id.*

*7 The letter closed with the following paragraph:

... if the above arrangements are acceptable please indicate so by returning a signed copy to us by August 22, 1995. Otherwise, we will need to make arrangements to revert to a full fee basis (retroactive to October 1994, net of fee and bonus payments already made, payable in January 1996), and discontinue additional CSC Index investment beyond monthly check-ups through February of 1996.

*Id.*

Tosco contends that these letters, and particularly the above closing paragraph,

demonstrate CSC's admission that the bonus arrangement proposed by CSC in the October 25 letter was not part of the agreement between the parties. Tosco further contends that on or about September 15, 1995 Tosco, in writing, accepted CSC's proposal to use the full fee basis, net of any amounts already paid, for services provided pursuant to Change Orders Nos. 1 and 2.

CSC disagrees and contends that these letter demonstrate no such thing. Further, CSC contends that its willingness possibly to compromise its claims against Tosco at that time are inadmissible under applicable law. CSC contends that Tosco owes it at least the sum of $775,000 for its professional fees and unreimbursed expenses for the period May-August 1995. CSC claims these sums are due in addition to the sum CSC claims it is owed pursuant to the bonus payments due under Change Order No. 1, pursuant to CSC's October 25 proposal letter.

Tosco, on the other hand, counterclaims alleging that CSC overbilled for its services and, based on quantum meruit, is only entitled to the reasonable value of its services rendered plus expenses therein incurred from March 15 - August 15, 1995. Tosco contends that, according to CSC's billings, the total of these amounts is at most $594,000. Tosco contends that since it already paid CSC $2,000,000 in response to CSC's billings, Index was overpaid in an amount no less than $1,406,000. [FN4]

FN4. Tosco contends further that CSC inflated its fees and that it did not produce the benefits to Tosco that it claims, but that the precise amount by which CSC inflated the amounts it claims are owed by Tosco cannot presently be calculated. However, Tosco's cross-claims are not at issue in the present motion.

V. *Third breach of contract cause of action, based on the August 15, 1995 proposal letter*

CSC contends that when Tosco's representative Bill McDaniel signed CSC's August 15, 1995 proposal letter, he bound Tosco to CSC's proposed bonus payment and

the formula for its calculation.   Shortly after McDaniel signed the letter he asked CSC to return the document to him, which CSC did. McDaniel testified that after retrieving the document, he destroyed it.   Neither party kept a copy of the signed letter, but there is no dispute that McDaniel signed it. CSC contends that McDaniel's signature bound Tosco and that Tosco breached the alleged August 15 agreement by terminating CSC's services, and further that as a result CSC has been damaged in an amount in excess of $1 million. Tosco contends that it never intended to accept the August 15 proposal letter and that McDaniel's signature on the letter could not modify the preexisting agreements between the parties contained in the N443 agreement and Change Order Nos. 1 and 2, because he did not have the authority alone to modify the N443 Agreement.

## VI. *Additional and alternative claims*

*8 CSC's fourth and fifth causes of action are fraud and negligent misrepresentation, based on essentially the same facts as its breach of contract claims.       Am.Compl.,   ¶¶   40-53. CSC's six and seventh causes of action reflect two alternative theories, that Tosco became indebted to CSC on an open book account in excess of $4 million and that CSC is entitled to an accounting of the "percentage of benefits [Tosco] received through [CSC's] re-engineering efforts."   *Id.* at ¶¶ 54-59.   CSC's eight and ninth causes of action allege that Tosco is liable in quantum merit and for unjust enrichment, in both cases for a sum exceeding $6 million. *Id.* at ¶¶ 60-69.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548,

91 L.Ed.2d 265 (1986);   *see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (the nonmoving party may not rely on the pleadings but must present significant probative evidence supporting the claim); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

The court's function, however, is not to make credibility determinations, *Anderson,* 477 U.S. at 249, and the inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.,* 809 F.2d at 631.

## ANALYSIS

The parties agree that California law governs this diversity action.   *See  HS Services, Inc. v. Nationwide Mut. Ins. Co.,* 109 F.3d 642, 644 (9th Cir.1997).

## I. *The Contract Claims*

At the heart of this action is CSC's contention that its proposal letters, related conversations between the parties and Tosco's conduct evidence      agreements      creating      or demonstrating binding obligations upon Tosco to compensate CSC pursuant to a contingent/ bonus framework.   Most of CSC's allegations and theories rely upon parol evidence, and CSC contends that this court must consider parol evidence to determine the parties' intent. [FN5]

> FN5. CSC further contends that it is not suing pursuant to the N443 agreement, but rather under three alleged separate agreements purportedly reached through oral negotiations and memorialized in CSC's own letters to Tosco.   However, CSC relies on the N443 agreement, and the subsequent Change Orders Nos. 1 and 2, to support its claim that Tosco accepted the compensation provisions contained in CSC's letters.   Thus the starting point of the court's analysis must be the original N443 agreement.

1998 WL 30035
(Cite as: 1998 WL 30035, *8 (N.D.Cal.))

Under California law, however, the court should ascertain the intention of contracting parties from the written contract alone, if possible. *Federal Deposit Ins. Corp. v. Air Florida System, Inc.*, 822 F.2d 833, 837 (9th Cir.1987), *cert. denied*, 485 U.S. 987, 108 S.Ct. 1289, 99 L.Ed.2d 500 (1988) (interpreting California law); see also Cal. Civil Code § 1638 (West 1996) ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"); *General Star Indem. Co. v. Superior Court*, 47 Cal.App.4th 1586, 1592, 55 Cal.Rptr.2d 322 (1996) (the "fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties, and such intent is to be inferred, if possible, solely from the written provisions of the contract").

**\*9** Furthermore, the execution of a contract in writing supersedes all negotiations or stipulations concerning matters which preceded or accompanied the execution of the instrument. Cal. Civil Code § 1625 (West 1996). Pursuant to the parol evidence rule as statutorily defined in Code of Civil Procedure section 1856, where the parties to a contract have set forth the terms of their agreement in a writing which they intend as the final and complete expression of their understanding, it is deemed integrated and may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. *Banco do Brasil, S.A. v. Latian, Inc.*, 234 Cal.App.3d 973, 1000, 285 Cal.Rptr. 870 (1991), *cert. denied*, 504 U.S. 986, 112 S.Ct. 2967, 119 L.Ed.2d 588 (1992). This "is not merely a rule of evidence excluding precontractual discussions for lack of credibility or reliability. It is a rule of substantive law making the integrated written agreement of the parties their exclusive and binding contract *no matter how persuasive the evidence* of additional oral understandings. Such evidence is legally irrelevant and cannot support a judgment." *Id.* (emphasis in original) (citations omitted); *see also Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc.*, 971 F.2d 272, 277 (9th Cir.1992), *cert. denied*, 507 U.S. 914, 113 S.Ct. 1267, 122 L.Ed.2d 663 (1993) ("parol evidence of terms not specifically included in the

[[integrated agreement] is not admissible").

However, the parol evidence rule will only apply to exclude extrinsic evidence if the contract at issue was integrated. *Traumann v. Southland Corp.*, 842 F.Supp. 386, 390 (N.D.Cal.1993). The question of whether the parties intended the written instrument to be an integration, i.e. the complete and final expression of their agreement, is one of law for the court. *Id.* If a writing is deemed integrated, extrinsic evidence is admissible only if it is relevant "to prove a meaning to which the instrument is reasonably susceptible." *Banco do Brasil*, 234 Cal.App.3d at 1001, 285 Cal.Rptr. 870 (citations omitted); *see also Brinderson-Newberg*, 971 F.2d at 276-77; *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871-72 (9th Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *Traumann*, 842 F.Supp. at 390. The application of this rule requires a two- part analysis: (1) "was the writing intended to be an integration, i.e. a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements"; and (2) "is the meaning susceptible of the meaning contended for by the party offering the evidence?" *Banco do Brasil*, 234 Cal.App.3d at 1001, 285 Cal.Rptr. 870 (citations omitted). If the court finds after preliminary consideration of the proffered parol evidence that the language of the contract is not susceptible to the asserted interpretation and is unambiguous, parol evidence may not be received for the purpose of varying the terms of the contract and the court may dispose of the case by summary judgment inasmuch as interpretation of an unambiguous contract is solely a question of law. *Brobeck*, 602 F.2d 871-72 (citing *Gardiner v. Gaither*, 162 Cal.App.2d 607, 614, 329 P.2d 22 (1958)).

**\*10** The first issue is whether the parties intended the written instrument to serve as the exclusive embodiment of their agreement. *Banco do Brasil*, 234 Cal.App.3d at 1001, 285 Cal.Rptr. 870 (citations omitted). "The instrument itself may help to resolve that issue.... [I]f [an integration] clause is adopted and used by the parties, it may well be

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

conclusive on the issue of integration." *Id.* (citations omitted).

In order to resolve this threshold issue, the court may consider all the surrounding circumstances, including prior negotiations of the parties. *Id.* at 1001, 285 Cal.Rptr. 870. However, in determining the issue of integration, parol evidence of a proposed or collateral agreement will be examined "only insofar as it does not directly contradict an express term of the written agreement; it cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms in the same agreement." *Id.* (citations and quotations omitted). Based on its analysis of the precedents and policies which involve the parol evidence rule, the court in *Banco do Brasil* set out a four-part analysis for the determination of integration in light of parol evidence:
(1) does the written agreement appear on its face to be a complete instrument; obviously, the presence of an integration clause will be very persuasive, if not controlling, on this issue; (2) does the alleged oral agreement directly contradict the written instrument; (3) can it be said that the oral agreement might naturally have been made as a separate agreement, or to put it another way, if the oral agreement had been actually agreed to, would it certainly have been included in the written instrument; and (4) would evidence of the oral agreement be likely to mislead the trier of fact.

*Id.* at 1002-03, 285 Cal.Rptr. 870 (citations omitted).

In *Banco do Brasil,* the court found that an examination of a guaranty agreement left no doubt that it was intended to be a complete expression of the parties understanding: on its face, it purported to fully describe the entire relationship among the parties, and further it contained an express integration clause. *Id.* at 1003, 285 Cal.Rptr. 870. Here, the N443 agreement purports to describe the entire relationship between the parties, and further it contains a detailed express integration clause. Def.'s Exh. C at 10142-43, ¶ 36. In fact, the integration clause addresses

the precise conflict at issue here:
This Agreement contains the complete agreement between the parties. In no event shall this Agreement include Contractor's terms and conditions or other provisions submitted by Contractor unless explicitly agreed to in writing and signed by a duly authorized representative of Company. All terms and conditions contained in work orders, purchase orders, proposals or other documents issued by Contractor to Company with respect to the Work to be performed hereunder shall be of no force and effect and shall be superseded by the terms and conditions set forth in this Agreement. This Agreement may only be altered, amended, or rescinded by a duly executed formal written agreement executed by both parties.

*11 *Id.* The clause could not state more clearly that the agreement is the complete expression of the parties' obligations and that CSC's proposals would be superseded by the express provisions of the contract, unless the parties executed a formal written agreement to modify the existing agreement. Thus, oral agreements to a contingent/bonus compensation framework, memorialized in CSC's letters but never executed as binding obligations, could not alter the integrated N443 agreement. See *id.;* *Banco do Brasil,* 234 Cal.App.3d at 1002-03, 285 Cal.Rptr. 870.

Next, in *Banco do Brasil* the court found that the alleged oral agreement directly contradicted the written instrument because the respondents claimed that the bank, through an oral agreement, promised respondents a line of credit which was an indispensable condition of respondents' obligations under the written contract. However, the written contract stated that there were no conditions whatsoever to respondents' liability, which was agreed to be "absolute and unconditional," and thus the respondents' claims were irreconcilable with the express terms of the written contract.

*Id.* at 1003-06, 285 Cal.Rptr. 870.

Here, Tosco admits that the contract allows that the parties *could* and possibly even

*planned* to formulate a calculation by which to award CSC a bonus as a part of its compensation in exchange for reduced up-front fees. In addition, parol evidence of the parties' negotiations indicate that Tosco was seeking a reduced-fee payment scheme to contain its costs for the project, at a time when it was in dire financial straits. Thus, it is not logically contradictory for CSC to assert that such an agreement was discussed in oral negotiations and specifically laid out in its proposal letters. However, the contract specifies in absolute terms the only manner by which such an alteration of the contract's terms could be effectuated: by a duly executed formal written agreement executed by both parties. Def.'s Exh. C at 10142-43, ¶ 36. Further, short of an executed contract altering the agreement, the agreement provides that the exclusive terms for compensation are contained in Exhibit "F", which contains no bonus provision. Def.'s Exh. C at 10130 ¶ 2; 10148; 10142-43, ¶ 36. Thus, it is directly contradictory for CSC to assert that oral negotiations and its own letters establish the existence of a collateral contingent/bonus compensation agreement, where the N443 agreement specifically excludes that possibility.

The third question pursuant to the *Banco do Brasil* analysis is whether the oral agreement might naturally have been made as a separate agreement, or to put it another way, if the oral agreement had been actually agreed to, would it certainly have been included in the written instrument. *Banco do Brasil,* 234 Cal.App.3d at 1003, 285 Cal.Rptr. 870. This consideration should be addressed in the context of the circumstances surrounding the entire transaction. *Id.* at 1005, 285 Cal.Rptr. 870. In *Banco do Brasil,* the court emphasized that the respondents were sophisticated and experienced businesspeople who were assisted by counsel and who were cautious and deliberate with respect to the negotiation, renegotiation, restructuring and execution of the agreement. *Id.* The court found that considering the circumstances surrounding the transaction and the interrelatedness of the obligations at issue, the trial court had clearly erred in finding that the alleged agreement

relied upon by respondents was "a naturally separate agreement" apart from the written contract and thus that the contract was not integrated. *Id.* at 1005-06, 285 Cal.Rptr. 870. The trial court had relied on a provision in the contract which indicated the existence of some arrangement between the parties relating to a line of credit, although the arrangement was left undefined by the contractual language. *Id.* at 1006, 285 Cal.Rptr. 870. In addition to finding that the trial court misread the contract, the court of appeals found a more fundamental flaw in the trial court's reasoning:

*12 ... that there may have been some prior, *or even pending,* discussions regarding a possible extension of a line of credit in the future is of no help in avoiding a conclusion of integration. If a *prior binding commitment* had been made, as opposed to incomplete negotiations, it would seem obvious, if not compelling, that the terms of such a credit arrangement would have been included in the very written agreement which purported to fully describe the entire debt relationship of the parties. Indeed, respondents themselves repeatedly have asserted that the claimed oral agreement was an integral and even indispensable part of the entire transaction....

[W]e have no trouble whatever concluding that a binding agreement for further credit would not have been "naturally separate" from the Guarantee Agreement.... This is particularly true here, where the contradiction of the oral agreement arises primarily from the fact that it was not included in the writing but stands apart, asserting the existence of a condition which is expressly denied by the writing.

*Id.* at 1007-08, 285 Cal.Rptr. 870 (emphasis added).

The present case is very close to the situation described above. There is ample parole evidence, and even an indication within the N443 agreement, that a reduced fee-bonus compensation scheme was *under consideration* at the time the contract was executed. In addition, CSC asserts and provides parole evidence that the main reason it won the

selection process leading to its employment by Tosco was that Tosco was seeking a less expensive means of gaining the consulting services it needed to restructure its Avon facility into a financially viable operation. Further, there is parole evidence that such schemes were discussed after the original agreement and near in time to the subsequent Change Orders. Based on the above evidence, CSC thus contends that its proposed scheme of compensation was integral to the agreement between the parties.

Yet the N443 agreement, which purports to describe the entire relationship between the parties, is explicit in its provisions for compensation and its exclusion of CSC's proposals in varying those terms, unless such proposals were formally adopted into the contract by a subsequent written agreement executed by both parties.    Further, the contradiction of the alleged oral agreement arises primarily from the fact that it was not included in the writing but stands apart, asserting the existence of a scheme of compensation which is expressly precluded by the writing.    Thus this court must conclude that despite the indication of the existence of pending negotiations regarding CSC's proposed scheme of compensation contained in the N443 agreement and surrounding circumstances, the compensation provided for by the contract, combined with the integration clause contained therein, direct the inevitable conclusion that such an alternative scheme would *not* have been "naturally separate" from the N443 agreement.    Rather, it *necessarily* would have been incorporated into the N443 agreement by a subsequent formally executed written agreement.    *See id.*

*13 Lastly, the court in *Banco do Brasil* concluded that it appeared obvious that given the circumstances and the carefully drafted language of the written agreement, a trier of fact would be misled by the contradictory terms of the alleged oral agreement. *Id.* at 1008, 285 Cal.Rptr. 870. In the trial below, the jury was allowed to rely on respondents' testimony, Banco's affirmative claims were rejected and the respondents were awarded substantial damages.    Absent testimony as to

such collateral oral agreement, the court found, the result necessarily would have been just the opposite. *Id.* Here, this court is faced with the same unavoidable conclusion.    The parol evidence offered by CSC to support its allegation of the existence of a collateral agreement surely would mislead the trier of fact away from the express terms of the N443 agreement, and away from the express limitations established therein on the modification of the agreement through subsequent conduct.

Thus, based on the four-part analysis established in *Banco do Brasil,* this court concludes that the N443 agreement was incorporated. [FN6] Nonetheless, as CSC correctly asserts, this conclusion does not preclude this court from considering the parol evidence offered by CSC. Even if a contract is integrated, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the contract is reasonably susceptible." *Id.* at 1008, 285 Cal.Rptr. 870 (citations omitted); *see also Brobeck v. Phleger & Harrison v. Telex Co.,* 602 F.2d at 871; *Brinderson-Newberg,* 971 F.2d at 276-277. "In the interest of a complete and systematic analysis, it is necessary to address this issue; however, when, as here, the claimed oral agreement is a direct contradiction of the written instrument, it is clear that the issue has already been resolved."    *See Banco do Brasil,* 234 Cal.App.3d at 1008, 285 Cal.Rptr. 870.  As the court stated in *Banco do Brasil:*

FN6. While CSC does not specifically make the argument, the court notes that the argument that no agreement may be integrated if it provides for a specific manner by which it may be modified in the future is without merit. *See Haggard v. Kimberly Quality Care, Inc. .,* 39 Cal.App.4th 508, 520-521, 46 Cal.Rptr.2d 16 (parties intended to memorialize their understanding with respect to grounds for termination, subject only to later writings signed by company's president;    alleged oral agreement modifying terms inadmissible to alter integrated agreement).    Thus the fact that prior and

contemporaneous negotiations and the N443 agreement itself may have laid the groundwork for subsequent adoption of a contingent/bonus compensation arrangement *pursuant to specific means for such a modification* does not affect whether the agreement as entered was integrated.

In the presence of such a conflict, it is not possible to say that the written instrument is susceptible to the proposed new meaning of the parties' [[ ]] relationship which would be supplied by the parol evidence offered by respondents. Testimony of intention which is contrary to a contract's expressed terms ... does not give meaning to the contract; rather it seeks to substitute a different meaning.

*Id.* Thus, the parol evidence offered by CSC must be excluded. *See id.* at 1008-09, 285 Cal.Rptr. 870 (citing *Pacific Gas and Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 442 P.2d 641 (1986)).

CSC asserts that the integration clause does not prevent this court from reviewing parol evidence when, as CSC alleges is the case here, (1) there is parol evidence of a different understanding between the parties, including the allegedly unambiguous testimony that it was its understanding that the N443 agreement was not the basis of the arrangement between Tosco and CSC; (2) the allegedly integrated agreement incorporates written documents which create an ambiguity; and, (3) the agreements are reasonably susceptible to CSC's interpretation that the agreement between the parties was for a reduced fee- bonus scheme of compensation. Each of these contentions will be addressed in turn.

*14 First, CSC asserts that the N443 agreement and Change Orders Nos. 1 and 2 are not clear and unambiguous as to the intent of the parties with regard to compensation, based on a litany of allegations including the following: (1) the testimony of William McDaniel, Tosco's "Company Representative" who acted as the liaison between the two companies; (2) the fact that Tosco paid CSC an amount which considerably exceeds the "cap" on Tosco's obligations under

the agreements; (3) Tosco's worksheets, which have not been produced by Tosco; (4) Tosco's alleged admission in an E-mail which suggests that Tosco's $2,000,000 payment to CSC was not what Tosco now claims it was; (5) the testimony of two other Tosco supervisory employees; (6) Tosco's failure to prove how the allegedly "unambiguous" language of the agreements led it to pay CSC an amount inconsistent with those agreements; (7) Tosco's contorted and contradictory explanations for the "cap"-exceeding payments.

These facts alleged by CSC may raise serious questions or doubts in regard to the conduct of the parties under the agreement. However, none of the above evidence looks at the *face* of the contract to find an ambiguity such that parol evidence could be employed to determine the parties' intentions. Such evidence is inadmissible parol evidence to prove an understanding contrary to the explicit terms of the agreement, unless there is an ambiguity or absurdity on the face of the written contract *itself.* Thus such evidence cannot substantiate CSC's allegation of facial ambiguity such to allow a different interpretation of the contract through parol evidence. Similarly, evidence of subsequent conduct goes not to what the parties were *obligated* to do, but rather to what they *did;* such evidence cannot make a contract susceptible to a contrary meaning, simply because one of the parties may have gone beyond the obligations in the contract. [FN7]

FN7. Nonetheless, CSC contends that Tosco's conduct subsequent to the execution of the N443 agreement and before any conflict arose-- specifically, Tosco's payments to CSC which exceeded the alleged "caps" on CSC's fees--is the clearest evidence that the agreements are susceptible to CSC's interpretations because the conduct demonstrates that Tosco did not *believe* that it had a fixed fee contract. CSC asserts that "the conduct of parties subsequent to the execution of the contract and before any controversy has arisen affords the most reliable evidence of the parties' intentions." *Kennecott Corp. v. Union Oil Co. of California,* 196 Cal.App.3d 1179, 1189, 242 Cal.Rptr. 403 (1987). However, "where the language of a contract is clear

and explicit, does not involve an absurdity and no ambiguity is shown, evidence of conduct is irrelevant." *Spitser v. Kentwood Home Guardians,* 24 Cal.App.3d 215, 220, 100 Cal.Rptr. 798 (1972). Only in a case of facial ambiguity or uncertainty, such as *Laborers Health and Welfare Trust Fund v. Kauffman & Broad of Northern California, Inc.,* 707 F.2d 412, 418 (9th Cir.1992), cited by CSC, can the finder of fact determine intent by examining circumstances surrounding the contract's execution. *See Luis v. Orcutt Town Water Co.,* 204 Cal.App.2d 433, 22 Cal.Rptr. 389 (1962); *Briggs v. Marcus-Lesoine, Inc.,* 3 Cal.App.2d 207, 212, 39 P.2d 442 (1934) ("The circumstances surrounding the execution of a contract in writing, and the subsequent conduct of the parties thereto, may be invoked to interpret it only in cases where upon the face of the writing itself there is doubt."). CSC cites a line of cases starting with the landmark case of *Pacific Case and Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 37- 40, 69 Cal.Rptr. 561, 442 P.2d 641, for the proposition that "rational interpretation requires at least a preliminary consideration of all credible evidence to prove the intention of the parties." It is true that "the test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous, but whether the offered evidence would be relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Id.* at 37, 69 Cal.Rptr. 561, 442 P.2d 641. However, pursuant to the very language quoted by CSC, if the court decides after considering this evidence, that *the language of the contract,* in light of all the circumstances, is *not* fairly susceptible of either one of the two interpretations contended for, the extrinsic evidence is inadmissible. *Id.* at 40, 69 Cal.Rptr. 561, 442 P.2d 641. Thus, in all of the cases cited by CSC, it was only *in light of a facial ambiguity* that the court considered parol evidence to determine the intentions of the parties. *See Rainer Credit Co. v. Western Alliance Corp.,* 171 Cal.App.3d 255, 261, 217 Cal.Rptr. 291 (1985) ("where a word or phrase can reasonably be understood in more than one way, the court must admit and consider extrinsic evidence to determine what the parties actually intended the word or phrase to mean"); *Daugherty Co. v. Kimberly-Clark Corp.,* 14 Cal.App.3d 151, 157, 92 Cal.Rptr. 120 (1971) (provision of contract was ambiguous as to whether compliance with contract was a condition precedent to recovery; in light of

substantial change to work required under contract and consistent ignoring of contractual terms, court should have considered issues of waiver and modification by examining parol evidence); *Southern Pacific Land Co. v. Westlake Farms, Inc.,* 188 Cal.App.3d 807, 815-816, 233 Cal.Rptr. 794 (1987) (extrinsic evidence should have been admitted where complaint alleged reasonable meaning which lessee had ascribed to the lease); *Appleton v. Waessil,* 27 Cal.App.4th 551, 555, 32 Cal.Rptr.2d 676 (1994).

Lastly, CSC is correct that "in cases of uncertainty ... the language of a contract should be interpreted most strongly against the party who caused the uncertainty," Cal. Civil Code § 1654, typically the drafter. *Heston v. Farmers Ins. Group,* 160 Cal.App.3d 402, 415, 206 Cal.Rptr. 585 (1984). Again, however, this rule only comes into play when an uncertainty is found on the face of the contract itself. *See id.*

CSC asserts that the N443 agreement incorporates written documents which create an ambiguity, or alternatively, that the N443 agreement supports CSC's interpretation. CSC contends that the ambiguity arises from the "precedence" rule of interpretation supplied by the agreement, when applied to the reference to CSC's May 18, 1994 proposal in Exhibit "A" (Scope of Work). Exhibit "A" states that CSC shall furnish all labor, materials, equipment, etc. required "to assist Tosco in re-engineering the procurement processes at the Avon refinery per [CSC's May 18, 1994] proposal ." CSC contends that because Exhibit "A" (Scope of Work) takes precedence over Exhibit "F" (Compensation), the reduced fee-bonus compensation scheme contained in CSC's May 18, 1994 proposal takes precedence over and supplants the compensation terms of Exhibit "F".

This interpretation is untenable for several reasons, reasons which further demonstrate that the compensation terms are not ambiguous. First, according to the "precedence" rule of interpretation, the very first term relating to compensation, on the first page of the Consulting Agreement section of the N443 agreement, states that the complete compensation to be paid by Tosco would be provided in Exhibit "F". Def.'s Exh.

C at 10130, ¶ 1. Second, Exhibit "A" defines what CSC is obligated to do under the contract (thus, it is entitled "Scope of Work")--it has nothing to do with compensation. *Id.* at 10144. CSC's May 18, 1994 proposal specifies the means and ends of the project and the roles of the parties in its execution. Def.'s Exh. B at 10092-95. Thus, the reference to and incorporation of the proposal by Exhibit "A" clearly and naturally refers to these specific details, and not CSC's proposed scheme of compensation, which is explicitly supplanted by the compensation and integration clauses. This is clear when reference to the May 18 letter is read in the full context of Exhibit "A". The portion of the May 18 letter incorporated in Exhibit A is that portion defined by the language preceding the reference. [FN8] This language is limited to the obligations of CSC's work and does not reference other provisions in the letter unrelated to the scope of Exhibit "A". Third, even if Exhibit "A" addressed compensation, it would be trumped by the precedential compensation provision of the Consulting Agreement, which states that Exhibit "F" determines compensation. Thus, the agreement is not ambiguous as to the terms of compensation, and it is not susceptible to CSC's interpretation of the terms of compensation. [FN9]

FN8. Exhibit "A" reads in its entirety:
Contractor shall furnish all labor, materials, equipment, tools, transportation, supervision, taxes, insurance, overhead, profit, and each and every item of expense, as may be necessary, to execute a four month project to assist Tosco in re-engineering the procurement pocesses [sic] at the Avon Refinery per Contractor's proposal dated May 18, 1994, attached.

Def.'s Exh. C at 10144.

FN9. Indeed, all that the May 18, 1994 letter says with regard to bonus-type compensation is that "a decision *will* be made" about it in the first two weeks of the project. Def.'s Exh. B at 10095 (emphasis added).

*15 CSC contends that Change Orders no. 1 and 2 are ambiguous, but does not indicate where in the Orders the ambiguities appear.

Change Order No. 1 could not be more clear or simple in its provision for a fixed amount of compensation, *see* Def.'s Exh. F, and CSC fails to point to any facial ambiguities. Instead, CSC attempts to mine ambiguities out of a mass of admittedly confusing parol evidence; as the court stated above, however, parol evidence is inadmissible for this purpose. Next, CSC contends that Change Order No. 2 is ambiguous or absurd on its face because it fails to provide for compensation. However, construing the Change Order in conjunction with the underlying N443 agreement, the order merely authorized an extension of time for CSC to perform pursuant to the existing terms and conditions. CSC contends it never intended to continue to work for free, while Tosco contends it did not intend to add cost to the completion of the project. However, these conflicting alleged intentions are not relevant where the face of the document refers to the N443 agreement, which expressly provides for and controls the granting of extensions and the assumption of greater compensation obligations.

CSC's main contention throughout is that the parol evidence supports CSC's interpretation of agreements between CSC and Tosco and contradicts Tosco's position. However, this contention incorrectly frames the issue. The question is whether the terms of the N443 agreement (as amended by Change Orders No. 1 and 2) are *susceptible* to the interpretation asserted by CSC through its proffered parol evidence--not whether the parol evidence supports CSC's interpretation of the parties' intentions or conduct. The N443 agreement as amended provides a fixed amount of compensation that does not include a bonus, and provides that such compensation was "full and complete consideration" for CSC's work. Further, the agreement provides the exclusive means for modifying compensation in the "Change of Work" and integration clauses: that modification be effectuated by a Change Order executed in writing by both parties--and explicitly precludes the possibility that compensation may be altered by oral or collateral agreements. Def.'s Exh. C at 10140 ¶¶ 23.1-23.3; and at 10142-3, ¶ 36. CSC's interpretation directly contradicts the express

terms of the agreement, and therefore the agreement is not reasonably susceptible to CSC's interpretation such to allow the introduction of parol evidence. *See Banco do Brasil,* 234 Cal.App.3d at 1008, 285 Cal.Rptr. 870.

For example, CSC claims that Tosco's subsequent conduct and statements-- mainly, the $2 million payment in March 1995-- showed that the agreement had been modified by Tosco's implicit acceptance of the October 24, 1994 proposal letter. In addition to legal precedent on the relevance of subsequent conduct, *see infra* note 7, there is an additional reason why this argument must fail: the N443 agreement is not susceptible to this interpretation. In addition to the explicit limitations on modification discussed above, the agreement states "no payment shall be construed as acceptance of defective work or improper matters." Def.'s Exh. C at 10137, ¶ 10 .2. While "improper matters" admittedly is a vague phrase, it surely included implications of acceptance of alternate compensation schemes not provided for in the explicitly limited contractual terms of compensation.

*16 In addition, the agreement provides for the non-waiver of defaults, such that Tosco's overcompensation of CSC through a bonus could not impair or constitute a waiver of the express terms of Tosco's compensation obligations, *Id.* at 10141, ¶ 30. The N443 agreement provided a fixed and definite compensation which could not be altered by overpayment. Change Order No. 1 also specified a fixed and definite compensation. Change Order No. 2 further extended time for performance, consistent with the provisions of the N443 agreement for extensions of time, *see id.* at 10139, ¶ 18), without any reference to new compensation, CSC's proposals or any bonus. Thus, Tosco's payment of a bonus of $77,446 in February 1995 and its payment of $2 million in March 1995 cannot be construed as "obligations" upon Tosco, nor acts capable of amending Tosco's contract rights. Tosco's contention that these payments were made in relation to perceived benefits, without obligation on its part and subject to the parties' continuing satisfaction with the

relationship can be squared with the terms of the N443 agreement as modified by the change orders. CSC's contentions regarding compensation cannot be squared with these agreements.

CSC next contends that Tosco agreed to its August 15 proposal, while CSC was already continuing to provide services under Change Order No. 2. It is undisputed that McDaniels, the contractually specified company representative who served as a liaison between the parties, signed the August 15 proposal, and that he subsequently asked for the document back and then destroyed it. CSC contends that McDaniel represented that he had the corporate authorization to sign such a document. Tosco terminated McDaniel's employment as of August 24, 1995; his severance agreement states that McDaniel was put on notice of the termination on August 9, whereupon he agreed to the following understanding: he was relieved of his duties, he was not to represent himself as an employee and was not authorized to enter contracts on behalf of Tosco, and he had no executory authority on behalf of Tosco. Pl.Exh. 20. CSC points to McDaniel's testimony that prior to his termination, he had believed he had the authority to *negotiate* the agreement, Pl.Exh. 25, 396:9-15; that he never told CSC he did not have the authority to negotiate the agreement, *id.* at 396:23- 397:18; and that he was the "Tosco representative ." *Id.* at 708:3-6. CSC contends that McDaniel destroyed the document, and Tosco attempted to retroactively rescind McDaniel's executory authority, because Tosco was concerned that McDaniel had bound it to the August 15 proposal. Lastly, CSC contends that the destruction of the document is evidence of Tosco's fraudulent intent.

However, the agreement provided that CSC's proposals and alleged oral modifications were of no effect to vary the plain terms of the contract, that changes could only be made by the formal execution of a signed Change Order, and that Tosco would not be liable for any costs incurred for work done prior to issuance of a work order unless expressly authorized in writing. Def.'s Exh. C at 10140,

¶¶ 23.1-23.3;  and at 10142-43, ¶ 36.   In addition, the N443 contract defined and limited the scope of McDaniel's authority as the company representative.   The agreement stated that CSC took notice that McDaniel had no authority with respect to the agreement other than that specified therein. Def.'s Exh. C at 10136, ¶ 3).   Further, while McDaniel testified that he was not clear whether he had the authority to sign the August 15 proposal, he told CSC in July 1995 that the signature of Clark Wrigley, an officer of the Avon Refinery, would be required on the document.   Pl.Exh. 25 at 552:3-22, 557:14-559:6.

*17 Tosco contends that it is not relevant what McDaniel believed about his authority, because the N443 agreement defined and limited the scope of his authority.   If a third person is on notice of a limitation upon an agent's authority, he cannot hold the principal responsible for a transaction with an agent in violation of such limitation.   *Terminex Co. v. Contractor's State License Bd.*, 84 Cal.App.2d 167, 171, 190 P.2d 24 (1948);   *see also* Cal.Civ.Code § 2318 (West 1996) (there can be no "ostensible" authority if the person who relies had actual or constructive notice of the restriction upon the agent's authority).   Thus, McDaniel's signature on the proposal could not bind Tosco.

*Traumann v. Southland Corp.*, a recent decision from this District, demonstrates the force and application of the parol evidence rule, in the particular context of the inability of agents' conduct to modify a contract in contradiction to its terms.   *Traumann* involved a franchise agreement between plaintiffs and Southland, the defendant franchisor.   The agreement gave Southland the right to disqualify applicants up to the date they opened a store for business.   841 F.Supp. at 388-89.   The agreement provided that Southland's agents were not authorized to modify, amend or waive the agreement "unless in writing and executed by an assistant Secretary."   It also contained an integration clause covering the "entire relationship" between the parties, and "merg[ing] or supercced[ing]" prior or contemporaneous "promises, representations,

agreements or understandings." *Id.* at 390-91. Southland's representative advised plaintiffs that "they had been accepted" and "not to worry about the disqualification provision." *Id.* at 389. Plaintiffs were told to start hiring for the store, and one of Southland's agents even sent a letter of congratulations to the plaintiffs, stating that plaintiffs had been accepted as the franchisee of the store.   *Id.* Yet, a week before plaintiffs were to open their store, Southland discontinued the franchise agreement;   the plaintiffs subsequently sued Southland for breach of contract and fraudulent promises. *Id.*

On summary judgment, the court dismissed the complaint, finding, based largely on the integration clause, that the written agreement was integrated and thus plaintiffs could not use parol evidence to directly contradict the express terms of the contract. *Id.* at 390.   The court stated that the plaintiffs' understanding of the assurances and congratulatory acceptance letter was irrelevant, because pursuant to the contract those representations could not modify the disqualification provision contained in the contract. *Id.*

Here, the N443 agreement provided for a fixed amount of compensation, inconsistent with the obligation to pay a bonus.   The agreement precluded modification of the compensation terms by oral or collateral agreements or by subsequent acts inconsistent with the compensation scheme.   Thus, that Tosco may have made other representations or paid one or more bonuses to CSC is similarly does not operate to modify Tosco's obligations under the contract. *See id.*

*18 In sum, because this court concludes that the N443 agreement is integrated, is not ambiguous, uncertain or involving absurdity, and further that it is not susceptible to the interpretation asserted by CSC, parol evidence and Tosco's subsequent conduct are not relevant to prove that the contract meant something other than its plain meaning. Further, CSC's contention that Tosco offers no evidence to prove that the bonus payment and prepayment were "discretionary" as opposed to obligatory is inapt.   Tosco is under no

obligation to prove its explanations for its conduct, where the plain meaning of the contract unambiguously limited Tosco's obligations. The sole issue to be decided this court is whether Tosco had an obligation to compensate CSC according to CSC's proposed contingent/bonus framework. In light of the clear terms of the N443 agreement and the finding that the agreement is not susceptible to CSC's interpretation, this court finds that Tosco was under no such obligation. [FN10]

FN10. At oral argument counsel for CSC made much of another purported ambiguity in the agreement, the "less 10% retention" provision of Exhibit F to the contract. The court finds that this term, which is commonly used in contracts of this nature, is not ambiguous nor is there anything in the record that renders it ambiguous.

## II. *The Fraud and Negligent Misrepresentation Claims*

While it is true that a recognized exception to the parol evidence rule permits evidence underlying a claim of fraud in order to nullify the main agreement, that rule does not apply where, as here, parol evidence is offered to show a fraudulent promise directly at variance with the terms of the written agreement. *See Banco do Brasil,* 234 Cal.App.3d at 1009, 1010, 285 Cal.Rptr. 870 ("If, to induce another to enter into an agreement, a party makes an independent promise without the intention of performing it, this separate false promise constitutes fraud which may be proven to nullify the main agreement; but if the false promise relates to the matter covered by the main agreement and contradicts or varies the terms thereof, any evidence of false promise directly violates the parol evidence rule and is inadmissible"); *see also Traumann,* 842 F.Supp. 386. Here, CSC alleges that the parol evidence demonstrates fraud, with regard to an alleged obligation directly contradicting the written terms of the N443 agreement. Evidence relating to this claim is barred by the parole evidence rule. *See id.*

The negligent misrepresentation claim fails for the same reason. *See Software Design and Application, Ltd. v. Price Waterhouse, LLP .,* 49

Cal.App.4th 464, 470-71, 57 Cal.Rptr.2d 36 (1996) (finding that parol evidence directly contradicted terms of integrated agreement, court dismissed negligence claim).

## III. *CSC's other claims*

CSC does not present arguments to support its claims for indebtedness on an open book account and an accounting of benefits. Tosco asserts only that the rights and obligations of the parties is governed by the N443 Agreement, as amended by Change Orders No. 1 and 2, and thus that CSC's claims which seek to impose additional obligations must fail. In light of this court's finding of a valid and integrated contract, the court agrees that CSC cannot succeed in its alternate theory of open book indebtedness because the contract did not include any provision regarding an open book account. Similarly, in light of the court's conclusion that the agreement between the parties did not include a bonus provision linked to the benefits afforded Tosco through CSC's services, CSC is not entitled to an accounting of such benefits.

*19 CSC's quantum meruit and unjust enrichment claims seek compensation for work performed pursuant the N443 agreement, as amended by Change Orders No. 1 and 2. It is well settled that an action based on an implied-in-fact or quasi- contract cannot lie where there exists between the parties a valid express contract covering the same subject matter. *Lance Camper Mfg. Co. v. Republic Indemnity Co. of America,* 44 Cal.App.4th 194, 203, 51 Cal.Rptr.2d 622 (1996); *see also Wal-Noon Corp. v. Hill,* 45 Cal.App.3d 605, 613, 119 Cal.Rptr. 646 (1975); *H.F. Fites Co. v. Harris Mfg. Co.,* 89 Cal.App. 427, 435, 264 P. 799 (1928) ("If the services claimed were rendered under the contract, there could be no quantum meruit basis of action, and, on the other hand, if the services were rendered upon the quantum meruit, there could be no basis of recovery on contract). Because CSC furnished services under--and was compensated under-- the N443 agreement, there is no basis for CSC's quasi- contract claims.

However, Change Order No. 2, which

1998 WL 30035
(Cite as: 1998 WL 30035, *19 (N.D.Cal.))

extended the period for performance of the project from March 1995 through January 1996, did not provide a term of compensation. Tosco admits that where terms of compensation are omitted, the law provides for quantum meruit recovery. Based on the reference by the change order to the N443 agreement and its statement that all other terms would remain the same, however, a reasonable interpretation could be that the Change Order intended only to authorize an extension of time for performance, and not additional compensation. Nonetheless, Tosco states that CSC should be paid the reasonable value of its services that it furnished from March 15 to August 31, 1995, the date of termination, less, or as a credit to, applicable overpayments (i.e., the $2 million "pre-payment"). Further, Tosco does not seek summary judgment on the quantum meruit and unjust enrichment claims. This they will remain for later resolution.

CONCLUSION

For the foregoing reasons, the court hereby GRANTS defendant Tosco's motion for summary judgment on CSC's first through seventh causes of action.

IT IS SO ORDERED.

END OF DOCUMENT